BEN AND BERNICE PERLMUTTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE PERLMUTTERS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91253, 91255. Filed June 18, 1965.

*Gene W. Reardon* and *Gene F. Reardon*, for the petitioners.
*Arthur B. Bleecher*, for the respondent.

HOYT, *Judge:* Respondent determined income tax deficiencies for the years and in the amounts, as follows:

*Ben and Bernice Perlmutter (docket No. 91253)*

| Taxable year: | Deficiency |
| --- | --- |
| 1956 | $15, 710. 82 |
| 1957 | 6, 800. 73 |
| 1958 | 4, 216. 85 |
| 1959 | 13, 164. 76 |

*The Perlmutters, Inc. (docket No. 91255)*

| Taxable FYE Jan. 31— | Deficiency |
| --- | --- |
| 1958 | $972. 86 |
| 1959 | 1, 114. 86 |
| 1960 | 15, 806. 18 |

These cases were consolidated for trial, briefs, and opinion. The parties have filed a stipulation with respect to various issues in both cases and effect thereto will be given in the recomputation under Rule 50. In his opening statement at the trial and on brief, counsel for petitioners stated in regard to the petitioners Ben and Bernice Perlmutter that all issues involving the years 1956, 1957, and 1958 have been settled and that only one issue would be litigated on the merits with respect to the asserted deficiency for 1959. Further, counsel stated in regard to petitioner, the Perlmutters, Inc., that all issues involving the fiscal years ended January 31, 1958 and 1959, have been settled and that only two issues would be litigated on the merits with respect to the asserted deficiency for the fiscal year ended January 31, 1960.

Shortly before the trial petitioners filed a motion to dismiss for lack of jurisdiction of the individual taxpayers' petition insofar as it relates to the taxable year 1959, and at the trial a similar motion as to the corporate taxpayer's petition insofar as it relates to the taxable fiscal year ended January 31, 1960, was filed. Both motions are based on the ground that the notice of deficiency for such taxable year in each case was illegally issued and therefore null and void. The motions were taken under advisement and trial of the consolidated cases proceeded.

The issues presented herein for decision are:

(1) In regard to the motions to dismiss for lack of jurisdiction, whether the notices of deficiency issued to the petitioners herein are

invalid, null, and void so as to deprive us of jurisdiction, and on the merits;

(2) In regard to the corporate petitioner for the fiscal year ended January 31, 1960, and with respect to a claimed deduction of $53,901.44 as compensation to Ben Perlmutter, whether respondent erred in disallowing $19,001.44 as excessive and in determining that only $34,900 constituted a reasonable allowance as compensation for personal services actually rendered;

(3) In regard to the corporate petitioner for the fiscal year ended January 31, 1960, and with respect to a claimed deduction of $105,028.24 as overhead expenses, whether respondent erred in disallowing $21,142.18 and allocating such amount as part of the cost basis of a shopping center constructed and retained by the corporate petitioner for rental purposes, and;

(4) In regard to the individual petitioners for the year 1959, whether respondent erred in failing to allow a deduction in the amount of $16,818.45 as an ordinary loss or business expense incurred in an alleged business venture known as Sonny's Auto Sales.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties with respect to both cases and the stipulation and exhibits attached thereto are included herein by this reference.

The individual petitioners Ben and Bernice Perlmutter are husband and wife, residing at 1635 Xavier, Denver, Colo. Their joint Federal income tax returns on a cash basis for the calendar years 1956, 1957, 1958, and 1959 were filed with the district director of internal revenue, Denver, Colo. A statutory notice of deficiency was sent by certified mail on November 28, 1960, to Ben and Bernice Perlmutter with respect to their taxable years 1956, 1957, and 1958, and a separate purported statutory notice of deficiency was sent to them by certified mail on January 19, 1961, with respect to their taxable year 1959.

The petitioner, the Perlmutters, Inc., is a corporation with its principal office at Littleton, Colo. The corporation's Federal income tax returns for the fiscal years ended January 31, 1958, 1959, and 1960 were filed with the district director of internal revenue, Denver, Colo. A statutory notice of deficiency was sent by certified mail on November 28, 1960, to the Perlmutters, Inc., with respect to its taxable fiscal years ended January 31, 1958 and 1959, and a separate purported statutory notice of deficiency was sent to it by certified mail on January 19, 1961, with respect to its taxable fiscal year ended January 31, 1960.

### *Jurisdiction*

The Secretary of the Department of the Treasury or his delegate is authorized by statute to determine that there is a deficiency in a

taxpayer's income tax and to send notice of such deficiency to the taxpayer by certified or registered mail. Such authority has been delegated to the Commissioner of Internal Revenue and in turn to the district directors for their respective internal revenue district. The Commissioner is not limited in his authority to delegate power to determine deficiencies or to issue statutory notices thereof.

George H. Allan held the position of district director, Denver, Colo., from November 22, 1954, until the effective date of his retirement from Government service on April 30, 1961. The last date that Allan was in the office and actually functioned as district director, was the day before Thanksgiving Day in November 1960. Thereafter, Allan was absent from his office on annual leave for about one week and then on sick leave continuously until the date of his retirement. He had an operation performed on or about December 5, 1960. Prior to beginning his annual leave and pursuant to his authority as district director, Allan designated the then assistant district director, Lawrence W. Hill, as the acting district director and Hill functioned in that capacity until on or about December 11, 1960, when V. Lee Phillips occupied the office and performed the duties of district director of internal revenue, Denver, Colo., pursuant to an appointment as hereinafter mentioned.

On November 21, 1960, the Commissioner of Internal Revenue addressed the following memorandum to the Under Secretary of the Treasury:

> It is requested that you ask the Civil Service Commission to approve for a period not to extend beyond August 1, 1961, an identical additional position in GS-16 for District Director in Denver, CSC No. 61.
>
> This position is required for the immediate reassignment of Mr. Lee Phillips, now District Director in Des Moines, to the Denver District. Mr. George H. Allan, present Denver District Director, is retiring on or before July 31, 1961, at which time Mr. Phillips will be placed on the permanent position and the temporary position will be canceled. In the interim period it is anticipated that Mr. Allan will be in and out of the hospital and on sick leave a substantial period of the time. Therefore, Mr. Phillips is needed immediately in Denver for orientation so that he can act for Mr. Allan during his absence.

On December 6, 1960, the Chairman of the U.S. Civil Service Commission addressed the following letter to the Secretary of the Treasury:

> In response to your letter of December 1, 1960, the Commission has given careful consideration to your request for approval of a temporary identical-additional position of District Director of Internal Revenue, Denver, Colorado, in grade GS-16.
>
> The Commission has approved the establishment of an identical-additional position of District Director of Internal Revenue, Denver, Colorado, in GS-301-16-134, under authority of the Classification Act of 1949, as amended (505(k)). This position will automatically be cancelled at the close of business on August 1, 1961.
>
> By direction of the Commission:

On December 7, 1960, the Acting Commissioner of Internal Revenue issued a "Notification of Personnel Action" to V. Lee Phillips directing his temporary reassignment from his position of district director, Des Moines, Iowa, to the position of district director, Denver, Colo., effective on December 11, 1960. Said notification stated in part that "This reassignment is to an interim position established for a period not to exceed COB 8-1-61 pending the retirement of the present District Director" and, further, that it was issued under authority of "C. S. Reg. 2.501 and SF-59 dated 12-6-60, Cent. Off. C.S. Comm."

Pursuant to the above-mentioned appointment as an identical additional district director of internal revenue, Denver, Colo., and in the official performance of his duties as such officer, V. Lee Phillips signed and issued by certified mail on January 19, 1961, a purported statutory notice of deficiency to Ben and Bernice Perlmutter for the taxable year 1959, and, also, to the Perlmutters, Inc., for the taxable fiscal year ended January 31, 1960, respectively. Each such communication gave notice to the taxpayer of the determination of a deficiency in income tax for the year involved and advised the taxpayer of the right to file a petition with this Court. Each such notice was issued on official stationery bearing the heading:

U.S. TREASURY DEPARTMENT
INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
*Denver 2, Colorado*

and concluded, as follows:

Very truly yours,

DANA LATHAM,
*Commissioner*,
By (S) V. LEE PHILLIPS,
*District Director.*

On January 19, 1961, George H. Allan was not officially functioning as district director of internal revenue, Denver, Colo., because of absence on extended sick leave. He did not authorize or direct V. Lee Phillips to sign and issue the above-mentioned notices of deficiency.

Petitioners, promptly and within a period of approximately 1 month, invoked the jurisdiction of this Court by filing herein petitions seeking redetermination of the deficiencies of which they had been notified. In each petition affirmative allegation is made that the deficiency for 1959 against the Perlmutters and for the fiscal year ended January 31, 1960, against the Perlmutters, Inc., was determined by the respondent (Commissioner of Internal Revenue.) These allegations of the petitioners were admitted by respondent's answers filed in both cases.

In docket No. 91253 a motion to dismiss was filed by petitioners after the case was set for trial and just a few weeks prior to the trial

date. In docket No. 91255 a similar motion was filed when the cases were called for trial. These motions were substantially identical and alleged that this Court lacks jurisdiction because the statutory notices of deficiency were issued by V. Lee Phillips as district director for the district of Colorado and that when they were issued he was not the legally constituted district director for Colorado; that said notices of deficiency being improperly and illegally issued by him are null and void and hence we are unauthorized to entertain the petitions filed herein.

### Reasonable Compensation

Petitioner Ben Perlmutter (hereinafter referred to as Ben) has been engaged in various phases of the construction business for 39 years. Ben learned the bricklaying trade at age 14 in Denver; at age 16 he went to New York City and began learning concrete foundation and construction work, and thereafter continuously engaged in the building construction business. Ben is the third generation of his family to engage in the construction business and he learned a great deal from his father and grandfather about such business.

The Perlmutters, Inc. (hereinafter sometimes referred to as the corporation or petitioner corporation), was incorporated in February 1955, and thereafter continuously engaged primarily in the development of a residential subdivision including the development of raw land and the construction and sale of residential homes at Littleton, Colo., in the Denver metropolitan area. In the fall of 1959, the corporation started construction of a shopping center at its subdivision for the convenience of the purchasers of its homes.

The corporation's initial capital was raised by Ben through a loan of approximately $100,000 to the corporation. Initially Ben and three other individuals, including his wife, a nephew, and niece, held all of the outstanding capital stock, but from about August 1955, and throughout the taxable years involved Ben has been the sole stockholder and owner of the corporation, except for a qualifying share held by his wife. From the time of its incorporation and throughout the taxable years Ben has been the president and dominant officer of the corporation. Ben also had personal interests in rental properties, the purchase and sale of parcels of land, and in a ranch at Watkins, Colo., during those years.

In 1955 the corporation purchased a tract of land embracing approximately 330 or 340 acres as to which the sellers had prepared a preliminary plat and designated two areas of 4 acres and 12 acres, respectively, as commercial and the balance residential. The contract of purchase required the sellers to obtain the commercial zoning and an abstract of title. Ben arranged for the purchase and the financing.

The corporation conducted all phases of its business embracing the final platting and development of its land with installation of streets, water, sewer, and utilities; planning and constructing residential homes; obtaining necessary construction loans and financing by purchasers; and the sale of its houses generally consisting of full-basement, three-bedroom homes ranging in price from $12,000-$13,000 to $18,000-$20,000.

Ben, as the president and dominant officer of the corporation, made all of the primary decisions with respect to all phases of the corporation's business. Ben selected the parcel of land acquired taking into consideration the price and location as regards population trends and zoning. Ben decided the overall planning for development of the subdivision and type of houses built. He supervised construction work and sales of houses, made preliminary credit appraisals of prospective purchasers, and gave the final approval on all sales which were made at the building-site office. Ben received bids and awarded contracts for all subcontractors' work which included installation of sewer and water utilities and basements. Ben arranged for all necessary financing of the corporation's activities. Each house was built with a separate construction loan for which the corporation issued its promissory note with Ben as a personal guarantor, secured by a deed of trust. The note was paid and canceled when the house was sold. Ben also arranged for permanent financing by the purchasers, about 80 percent with FHA and VA loans and 20 percent with conventional bank loans. During the years involved substantially all the loans to the corporation and the financing arranged for purchasers of homes, were handled by the mortgage brokerage firm of Kassler & Co. of Denver, Colo., through Ben's efforts.

During the years involved the corporation employed Ben's brother, Dave Perlmutter (hereinafter referred to as Dave), in a supervisory capacity as general manager. Dave spent the entire day at the company's building-site office and performed varied important managerial functions for the corporation including the hiring and firing of employees, dealings with suppliers of materials, etc., but always subject to Ben's final decision on all matters. Dave was not a stockholder or officer of the corporation.

At the beginning of the corporation's business activities and during the years prior to 1959, Ben spent all day at the company's building-site office, sometimes 7 days a week. During 1959 and thereafter Ben spent one-half to three-quarters of a day at such office and the balance of the time was spent in various business activities, at times seeking more advantageous interest rates on loans to the corporation, at other times seeking further business opportunities, and mostly looking for additional land. The success of the corporation's business and its

reputation as an excellent builder of homes, was due primarily to Ben's efforts, experience, and organizational ability.

Ben was not paid any salary during the corporation's first fiscal year ended January 31, 1956, and thereafter he was the only corporate officer paid a salary. Ben's salary for each of the years ended January 31, 1957 and 1958, was authorized by a corporate resolution recorded in its minute book, but was not similarly provided for in the subsequent years during which Ben decided the amount of his salary as the year progressed based upon consideration of the time and effort he put into the business and the volume of business done. The corporation's minute book was kept on a very informal basis and did not record all corporate actions. The minute book was kept in the custody of the corporation's attorney who was also its secretary and he did not receive any salary as such officer.

The parties are agreed that petitioner corporation paid Ben a salary for the years and in the amounts as follows:

| FYE Jan. 31— | Salary |
| --- | --- |
| 1956 | None |
| 1957 | $13,000.00 |
| 1958 | 30,900.00 |
| 1959 | 34,900.00 |
| 1960 | 53,901.44 |

During the fiscal years ended January 31, 1956 to 1960, inclusive, the corporation never declared or paid a dividend.

The parties are agreed that the following schedule shows, *inter alia*, a comparison of the corporation's gross receipts (of which 90 percent or more represented amounts which were financed), gross income, total deductions exclusive of officer's salary, Ben's salary, taxable income, and earned surplus, as per the corporation's tax returns for the fiscal years ended January 31, 1956 to 1960, inclusive:

PERLMUTTERS, INC.

*Comparison of sales, officer's salary, profits and earned surplus per returns, Jan. 31—*

| | 1956 | 1957 | 1958 | 1959 | 1960 |
| --- | --- | --- | --- | --- | --- |
| Gross receipts | $909,134.87 | $1,144,413.43 | $3,259,228.63 | $2,070,057.95 | $1,595,579.95 |
| Less: Cost of operations | 828,122.32 | 1,058,090.72 | 2,830,625.16 | 1,747,950.86 | 1,349,408.48 |
| Gross profit | 81,012.55 | 86,322.71 | 428,603.47 | 322,107.09 | 246,171.47 |
| Interest income | | | 1,055.88 | 1,018.04 | |
| Rent income | | | 2,100.00 | 4,200.00 | 7,980.00 |
| Gross income | 81,012.55 | 86,322.71 | 431,759.35 | 327,325.13 | 254,151.47 |
| Less: Total deductions minus officer's salary | 69,583.62 | 43,642.75 | 346,418.73 | 245,818.21 | 195,964.64 |
| Income before officer's salary | 11,428.93 | 42,679.96 | 85,340.62 | 81,506.92 | 58,186.83 |
| Less: Ben's officer's salary | 0 | 13,000.00 | 30,900.00 | 34,900.00 | 53,901.44 |
| Taxable income | 11,428.93 | 29,679.96 | 54,440.62 | 46,606.92 | 4,285.39 |
| Tax | 3,428.68 | 9,933.58 | 22,809.12 | 18,735.60 | 1,285.62 |
| Earned surplus | 8,000.25 | 27,746.63 | 59,378.13 | 87,249.45 | 89,090.77 |

Ben's salary represented an approximate percentage of the corporation's gross income for the indicated years, as follows:

| FYE Jan. 31— | Percentage (approx.) |
|---|---|
| 1956 | 0 |
| 1957 | 15 |
| 1958 | 7 |
| 1959 | 11 |
| 1960 | 21 |

On its income tax return for the fiscal year ended January 31, 1960, the petitioner corporation claimed a deduction in the amount of $53,901.44 for compensation to its president, Ben. Respondent determined that $19,001.44 thereof was excessive and disallowed as a deduction and further determined that $34,900 was a reasonable allowance for salary or other compensation for personal services actually rendered.

Under item 5 on the joint individual income tax return of Ben and Bernice Perlmutter for the calendar year 1959, Ben reported a salary of $34,900 received from Perlmutters, Inc.

A reasonable compensation for the services of Ben Perlmutter as president of petitioner corporation for its fiscal year ended January 31, 1960, was not in excess of the amount determined by respondent.

### Allocation of Overhead Expense

At the time petitioner corporation initially acquired the land and planned the development of a residential subdivision at Littleton, Colo., it was contemplated that a shopping center would be constructed in connection therewith and for the convenience of the purchasers of its homes. The necessary commercial zoning was obtained by the seller of the land under petitioner's contract of purchase.

In or about the first part of 1959, the petitioner corporation decided to proceed with the construction of a shopping center; an architectural firm, Simon & Hipp, was engaged to draw the plans and also a permit to build was obtained from the Arapahoe County Council by the company's attorney. On July 15, 1959, the corporation's board of directors adopted a resolution authorizing a loan to be made by Kassler & Co. of $450,000 evidenced by the corporation's note and secured by a deed of trust on certain described property and the shopping center improvements to be constructed thereon. At sometime about or prior to mid-1959 the Ambrose-Williams Co., a real estate brokerage firm specializing in shopping-center properties, was engaged to solicit and obtain leases from tenants, and most of available space was committed sometime prior to October 1959. A couple of months prior to October 1959, a survey of the shopping center site was made and a construction superintendent was hired; an assistant superintendent was hired in October.

Beginning in October 1959, and during the fiscal year ended January 31, 1960, petitioner corporation constructed the shopping center, to which it retained title, for rental purposes and at a total cost, as follows:

| | |
|---|---:|
| Land | $ 75, 350. 00 |
| Building | 223, 700. 21 |
| Land in triangle | 41, 100. 00 |
| **Total cost** | 340, 150. 21 |

The parties have stipulated that during the fiscal year ended January 31, 1960, petitioner corporation incurred costs totaling $1,349,-940.48 in connection with the construction of homes for sale in the ordinary course of its business and, further, incurred overhead expenses totaling $105,028.24 which it deducted on its income tax return for that year, as follows:

| | |
|---|---:|
| Officers' salaries | [1] $34, 900. 00 |
| Other overhead salaries | 33, 871. 36 |
| Depreciation | 3, 765. 57 |
| Insurance | 6, 061. 52 |
| Legal and audit | 8, 050. 00 |
| Office expense | 2, 991. 28 |
| Truck expense | 8, 451, 18 |
| Utilities | 6, 937. 33 |
| **Total overhead expense** | 105, 028. 24 |

[1] As adjusted per notice of deficiency.

Petitioner corporation did not allocate any of the above overhead expenses, either on its books or on its income tax return, as an additional cost of the shopping center.

In his notice of deficiency, respondent disallowed the amount of $21,142.18 of the claimed business expense deduction from income, based upon his determination that such amount constituted part of the cost basis of the shopping center retained for rental purposes. Respondent's determination was based upon an allocation of expenditures to the shopping center as made by his revenue agent by the following computation:

| | |
|---|---:|
| Cost of retained property (shopping center) | $340, 150. 21 |
| Cost of other property (residential) | 1, 349, 940. 48 |
| Total cost | 1, 690. 090. 69 |

$$\frac{\$340, 150. 21}{\$1, 690, 090. 69} = .2013$$

| | |
|---|---:|
| Total overhead expense | $105, 028. 24 |
| | ×. 2013 |
| Allocated to shopping center | 21, 142. 18 |

The hereinabove listed items of overhead expenses totaling $105,-028.24 and also the cost of residential construction related to the 12 months of the corporations fiscal year ended January 31, 1960. In connection with his audit, the revenue agent listed such expense items and made his allocation solely on the basis of the computation set out in the next preceding paragraph and he made no attempt to break down the expenses by the months in which incurred or allocate portions thereof as pertaining specifically to shopping center and residential construction activities, respectively. As hereinabove mentioned no allocation was made on the books of the corporation and its certified public accountant, although recognizing that some portion of items of expenses were properly allocable to the cost of the shopping center, found that with the facts he had at the time of his audit of the company's books, he could not begin to make any allocation and thus charged the total to expense of the residential construction.

The corporation's regular office was used in carrying on its usual activities in the construction and sale of homes throughout the fiscal year ended January 31, 1960, and prior to October 1959, it was also used to whatever extent necessary in the shopping-center planning and preliminary work prior to construction. When the shopping-center construction was actually started in October 1959, a temporary field office building with telephone, electricity, etc., was set up on the building site as headquarters for the superintendent and his assistant and, also, for the union labor hired on that job entirely separated from the nonunion labor regularly employed by the corporation on its residential construction.

During construction Ben spent 3 to 5 hours a week and Dave spent from 5 to 7 hours a week at the shopping-center construction site inspecting the progress of the work and they drove to the building site in company cars. Every couple of days or so both Ben and Dave held short conferences with the superintendent at the corporation's regular office. The corporation's bookkeeper, in addition to his usual work pertaining to residential construction and sales, handled all the bookkeeping for the shopping-center construction, including checking invoices for materials, preparing checks for payment of bills, and making separate payrolls for the union and nonunion labor. The corporation's accountant, Irving Kippur, visited its regular office once a month to audit the bookkeeper's records and post entries in certain books of account maintained by Kippur at his own office. The corporation's attorney devoted some time on the shopping-center project such as obtaining the building permit, checking over the contract with Ambrose-Williams Co. and the leases obtained by that company for rental of shopping-center space, and checking over contracts entered into with subcontractors for various construction work. Waterlines

and utilities for the shopping center were previously installed in connection with the residential construction.

### Sonny's Auto Sales

At the times material herein Ben Perlmutter's daughter, Barbara, was married to Marvin Bernstein, also known as Sonny Bernstein, and sometimes hereinafter referred to as either Marvin or Sonny.

On February 20, 1958, Barbara Bernstein executed before a notary public an application to the State of Colorado for issuance of a "Used Motor Vehicle Dealer's License" in the firm name of Sonny's Auto Sales with place of business at 740 Broadway, Denver. In answer to a required statement as to whether the business was owned by an individual, copartnership, or corporation, together with a listing of the name of the individual owner and names of active partners or officers of a corporation, the application showed Barbara Bernstein as the sole individual owner. The application listed Marvin Bernstein as a salesman. In answer to a required list of members of a partnership or corporation having a financial interest therein, the application showed only the name of Barbara Bernstein. The application was filed together with a $5,000 corporate surety bond signed by Barbara Bernstein, principal, and by the Columbia Casualty Co. A Motor Vehicle Dealers Administration inspection report on Sonny's Auto Sales, was made on February 25, 1958. Barbara Bernstein's notarized application dated June 26, 1958, for renewal of the Used Motor Vehicle Dealer's License No. 1238, was essentially the same as the above-mentioned original application. A Motor Vehicle Dealers Administration inspection report of April 29, 1959, showed that Sonny's Auto Sales was "Out of Business." A letter dated April 30, 1959, from the Motor Vehicle Dealers Administration addressed to "Mrs. Barbara Bernstein" stated *inter alia* that "Your Dealer's License No. 1238 was canceled as of April 29, 1959." The original and renewal applications for the above-mentioned dealer's license did not show that Ben Perlmutter had any interest in the business of Sonny's Auto Sales, financial or otherwise.

On February 24, 1958, Ben Perlmutter and Sonny Bernstein visited the Guaranty Bank & Trust Co. of Denver to establish a line of credit for Sonny's Auto Sales, which was refused. On the same date a checking account was opened in that bank in the name of Sonny's Auto Sales requiring the signatures of both Ben Perlmutter and Sonny Bernstein on all checks issued against such account. The bank's signature card shows that it was not a partnership account but instead a joint account with right of survivorship.

On February 24, 1958, Ben Perlmutter issued his personal check in the amount of $5,000 payable to the order of Sonny's Auto Sales, which was deposited in the above-mentioned account. During March,

April, and May, 1958, Ben issued additional personal checks in varying amounts payable to Sonny's Auto Sales which were deposited in the said account. Such personal checks issued by Ben from February to May 1958, inclusive, totaled $13,500.

The certified public accountant who performed accounting services for the Perlmutters, Inc., and for Ben Perlmutter, individually, was engaged by Ben to do the accounting work of Sonny's Auto Sales. Ben met the accountant regularly every Monday evening at the place of business of Sonny's Auto Sales to go over its books, records, contracts, balance sheets, and bank account. In September 1958, the accountant made an individual balance sheet of Ben for his personal credit purposes at the First National Bank of Denver, and thereon listed among his assets an item designated "Advance Sonny's Auto Sales, $13,500."

In or about July 1958, Ben engaged the services of Tino J. Soto as salesman, finance man, and buyer for Sonny's Auto Sales. Soto had been in the new and used car business for several years prior thereto. Soto made purchases and sales of used cars and handled the purchasers' finance paper which was discounted usually at the First National Bank of Denver as arranged for by Ben. Soto also obtained the signatures of both Ben and Sonny on all checks issued by Sonny's Auto Sales during period of his employment. Sonny Bernstein also made purchases and sales of used cars. In addition to Monday evening, Ben stopped by Sonny's Auto Sales at least two evenings a week to check with Soto on the stock of cars on hand, sales, records, bank balance, etc. Soto continued as an employee of Sonny's Auto Sales until it went out of business in April 1959. Barbara Bernstein never worked for or took any part in the operation of Sonny's Auto Sales during the period of Soto's employment from July 1958 to April 1959.

Between April 15 and September 4, 1959, Ben Perlmutter issued at least 15 checks drawn on his personal bank account at the First National Bank of Denver, in the total amount of $2,031.09, to pay amounts due various creditors of Sonny's Auto Sales. Those payments were made by Ben because Sonny's Auto Sales had ceased doing business and no longer had a bank account and, further, because Ben considered that he was obligated to pay such debts.

Ben Perlmutter's above-mentioned advances to and payments on behalf of Sonny's Auto Sales totaled $15,531.09 during the years 1958 and 1959.

The joint income tax returns of Ben and Bernice Perlmutter for the years 1958 and 1959, in evidence herein, do not report any amount as profit or loss from Sonny's Auto Sales, under item 1, Schedule H, "Partnership" or under item 8, "Profit (or loss) from business from Schedule C," and no Schedule C was attached thereto.

On his joint income tax return for 1959, on Schedule D, "Gains and Losses From Sales or Exchanges of Property, (1) Capital Assets," Ben Perlmutter reported short-term capital gains totaling $23,382.74 from two sales of properties and claimed a short-term capital loss in the amount of $16,818.45 identified as "Sonny's Auto Sales" and shown to have been acquired in December 1958, at a cost basis of $16,818.45, and disposed of in May 1959, for nothing. Such reported loss was subtracted from the reported gain resulting in a net short-term gain in the amount of $6,564.29 which was carried over to page 3 of the return and included in the total amount entered on the face of the return under item 10, "Other income (or loss) from page 3 (Dividends, Interests, Rents, Pensions, etc.)."

In his statutory notice of deficiency with respect to Ben's joint income tax return for 1959, *inter alia*, respondent determined a net loss of $3,914.35 from the sale of capital assets in lieu of the reported $6,564.29 gain and that the deduction for such loss was limited to $1,000. In connection with that determination the respondent added additional sales or exchanges of property to the Schedule D capital gains or losses, but eliminated the claimed short-term capital loss on Sonny's Auto Sales in the amount of $16,818.45 and thereby disallowed such claimed loss. No specific explanation of the disallowance was given in the statement attached to the notice of deficiency, but the revenue agent's report on which it was based reported that the amount of the claimed loss on Sonny's Auto Sales constituted a gift by Ben to Marvin or Barbara Bernstein and therefore was not deductible from income.

OPINION

## Motions To Dismiss

The motions to dismiss for lack of jurisdiction of the petition of Ben and Bernice Perlmutter for their taxable year 1959, and of the petition of the Perlmutters, Inc., for its taxable fiscal year ended January 31, 1960, are predicated upon allegations that the purported notice of deficiency for each such taxable year, was illegally issued by a person not duly authorized to do so and therefore null and void, and, accordingly, this Court has no jurisdiction of the petitions for those years.

Petitioners contend that legal provision is made for one district director of internal revenue for the Denver district; that George H. Allan held said office on the crucial date of January 19, 1961, with the duly delegated authority to issue notices of deficiency as the district director or to redelegate said authority to someone under his supervision; and that Allan neither issued nor authorized the issuance of the notices of deficiency involved herein. Petitioners contend that

since there was no vacancy in the office of district director of internal revenue for the Denver district until Allan's retirement on April 30, 1961, V. Lee Phillips could not be legally appointed to such office prior to that date. Petitioners further argue that there is no legal authority for the creation of an office of identical additional district director to which Phillips was ostensibly appointed and, accordingly, the purported acts of Phillips in signing and issuing the notices of deficiency as "district director" are null and void. Petitioners also contend that, aside from the above-mentioned purported appointment which was a nullity, Phillips was never legally given any other specific authorization to issue the notices of deficiency involved. Petitioners conclude that on the above-stated grounds the proceedings with respect to said years should be dismissed for lack of jurisdiction.

Petitioners cite *Dudley* v. *Commissioner*, 258 F. 2d 182 (C.A. 3, 1958), affirming 28 T.C. 992 (1957), as authority sustaining their position. In that case the petition filed with this Court was dismissed for lack of jurisdiction because no statutory notice of deficiency, as authorized by section 6212(a) of the Internal Revenue Code of 1954, had been issued by the Secretary of the Treasury of the United States or his delegate. Both the factual situation and the basic issue there involved clearly distinguish that case from the instant proceeding. The *Dudley* case involved a territorial income tax liability asserted by an officer of and under statutes pertaining to the Government of the Virgin Islands, and the effect of the decision was that neither the Secretary of the Treasury of the United States nor this Court has jurisdiction over such territorial taxes. In the instant proceeding there is no question but that the tax involved is a United States income tax as to which the Secretary of the Treasury or his delegate is authorized to issue a notice of deficiency and the only issue is whether the notices of deficiency issued on January 19, 1961, were valid.

Respondent contends that although George H. Allan continued to hold the position of a district director of internal revenue for the Denver district pending his retirement on April 30, 1961, he was not officially functioning as such officer during his extended leave of absence from Thanksgiving Day 1960 until April 30, 1961. Respondent further contends that on an interim basis pending Allan's retirement and on December 11, 1960, V. Lee Phillips was legally appointed as identical additional district director of internal revenue for the Denver district pursuant to authority vested in the Secretary of the Treasury and the Commissioner of Internal Revenue and, also, with the approval of the Civil Service Commission and, therefore, the disputed notices signed and issued by Phillips as official acts in performance of the duties of his office, constitute appropriate statutory notices of deficiency and upon the timely filing of the petitions herein this Court

acquired jurisdiction to redetermine the asserted deficiencies. We agree with respondent.

The Internal Revenue Code of 1954, as amended, sets forth various provisions with respect to the powers and duties vested in the Secretary of the Treasury and the delegation thereof to his subordinates. Section 7701(a)(12)(A) provides that the term "Secretary or his delegate" means the Secretary of the Treasury, or any officer, employee, or agency of the Treasury Department duly authorized by the Secretary (directly or indirectly by one or more redelegations of authority) to perform the function mentioned or described in context. Section 7801(a) provides that the administration and enforcement of the internal revenue laws shall be performed by or under the supervision of the Secretary of the Treasury. Section 7802 provides that there shall be in the Department of the Treasury a Commissioner of Internal Revenue who shall have such duties and powers as may be prescribed by the Secretary. Section 7803 provides that the Secretary or his delegate is authorized to employ such number of persons as deemed proper for the administration and enforcement of the internal revenue laws; to issue all necessary directions, instructions, and orders to such persons; and to *determine and designate the posts of duty of all such persons*. Section 7805 provides that the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of the internal revenue laws. Section 6212(a) provides that if the Secretary or his delegate determines that there is a deficiency in respect of any tax imposed by subtitles A or B (income taxes or estate and gift taxes) he is authorized to send notice of such deficiency to the taxpayer by certified or registered mail.

The regulations with respect to the above statutory provisions are similar thereto. Further, the regulations provide, in part, as follows:

Sec. 301.7701–9 Secretary or his delegate.

(b) In any case in which a function is vested by the Internal Revenue Code of 1954 or any other statute in the Secretary or his delegate, and Treasury regulations or Treasury decisions approved by the Secretary or his delegate provide that such function may be performed by the Commissioner, assistant commissioner, regional commissioner, assistant regional commissioner, *district director*, director of a regional service center, or by a designated officer or employee in the office of any such officer, *such provision in the regulations or Treasury decision shall constitute a delegation by the Secretary of the authority to perform such function to the designated officer or employee.* If such authority is delegated to any officer or employee performing services under the supervision and control of the Commissioner, such provision in the regulations or Treasury decision shall constitute a delegation by the Secretary to the Commissioner of the authority to perform such function and a redelegation thereof by the Commissioner to the designated officer or employee.

(c) An officer or employee, including the Commissioner, authorized by regulations or Treasury decisions to perform a function shall have authority to redelegate the performance of such function to any officer or employee performing services under his supervision and control, unless such power to so

redelegate is prohibited or restricted by proper order or directive. *The Commissioner may also redelegate authority to perform such function to other officers or employees under his supervision and control* and, to the extent he deems proper, may authorize further redelegation of such authority.
[Emphasis supplied.]
Sec. 301.7701–10 District director.

The term "district director" means the district director of internal revenue for an internal revenue district. The term also includes the Director of International Operations.

Sec. 301.6212–1 Notice of deficiency.

(a) *General rule.* If a district director (or an assistant regional commissioner, appellate) determines that there is a deficiency in respect of income, estate, or gift tax imposed by subtitle A or B of the Code, he is authorized to notify the taxpayer of the deficiency by registered mail prior to September 3, 1958, and by either registered or certified mail on and after September 3, 1958.

In our opinion it is clear that pursuant to statutory authority and the regulations promulgated thereunder and, further, with the approval of the Secretary of the Treasury and the Civil Service Commission on the administrative matter as to establishment of the position, grade classification, and salary, the Commissioner of Internal Revenue determined and designated V. Lee Phillips to the post of duty of temporary identical additional "district director" of the Denver district, effective December 11, 1960, to perform the functions of that office which embraced the legally delegated authority to sign and issue the statutory notices of deficiency involved herein. Accordingly, the filing of the petitions herein conferred jurisdiction upon this Court to redetermine the asserted deficiencies, sec. 6213 of the 1954 Code. Cf. *Philip F. Flynn*, 40 T.C. 770 (1963).

In our opinion it is wholly immaterial that the designation was made by an interim appointment of Phillips as identical additional district director pending Allan's extended leave of absence and retirement from his office of district director on April 30, 1961, or that Allan had previously designated his assistant as acting district director, since both Allan and his assistant were officers or employees under the supervision and control of the Commissioner of Internal Revenue. Pursuant to section 301.7701–9(c), Proced. & Admin. Regs., *supra*, the Commissioner was specifically empowered to "redelegate authority to perform such function to other officers or employees under his supervision and control." Matters pertaining to the necessity for and the effective date of Phillips' appointment fall entirely within the administrative policy and procedure of the Commissioner. It has long been held that it is not the duty or province of this Court to question such matters, for to hold otherwise would constitute an unwarranted interference with the functions of the Commissioner and, also, burden and impede the administration of the internal revenue laws beyond any necessity for protection of the statutory rights of the taxpayer. *Cleveland Home Brewing Co.*, 1 B.T.A.

87, 91 (1924); *Southern California Loan Association*, 4 B.T.A. 223, 225 (1926); *Levine Brothers Co., Inc.*, 5 B.T.A. 689, 691–692 (1926); *Mead Realty Co.*, 21 B.T.A. 1062, 1065 (1931); *Charles Crowther*, 28 T.C. 1293, 1301 (1957), affirmed on this point 269 F. 2d 292 (C.A. 9, 1959); and *Philip F. Flynn, supra.*

Even if we were not constrained to reach this conclusion, we would decide this issue in favor of respondent on another ground. The burden of establishing that the notices in question were invalid, null, and void is on petitioners. They have failed completely to establish that V. Lee Phillips was without delegated authority to issue the deficiency notices here involved. He was not called as a witness, and the only evidence adduced by petitioners was the testimony of George Allan that he had not redelegated his authority to issue such notices to Phillips. There was no proof that the respondent, the Commissioner of Internal Revenue, had not delegated such authority to Phillips. See T.D. 6118, 1955–1 C.B. 698, 719.

The presumption of official regularity has been often applied to resolve disputes such as this, and certainly we must start with the premise that "Acts done by a public officer 'which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter.' " *R. H. Stearns Co.* v. *United States*, 291 U.S. 54 (1934). No evidence here establishes lack of authority from the Commissioner to issue the deficiency notices under attack. As long ago as 1927, when we were in our infancy, we said in *Fanny Newman et al.*, 6 B.T.A. 373, 378 (1927), rejecting another taxpayer's similar argument:

We must assume that the Deputy Commissioner was acting regularly and under proper authorization of the Commissioner in this instance * * *

Here we must assume that Phillips was acting regularly and under proper authorization of the Commissioner.

We cannot accept petitioners' arguments as proof that V. Lee Phillips lacked authority to issue statutory notices when these notices were issued by him for the Commissioner. Statements in motions and briefs are not evidence. Respondent has no burden to establish Phillips' authority in the absence of any evidence that he lacked it. It was not respondent's burden to establish that Phillips had delegated authority to issue deficiency notices but on the contrary petitioners had the burden to prove that he was without such authority. *United States* v. *Buschman*, 208 F. Supp. 531 (E.D. N.Y. 1962).

Furthermore, we are not persuaded by petitioners' arguments that there can be only one district director in a district at a given time and that therefore the issuance of a notice of deficiency by one other than that director is illegal and invalid. It has long been established that the Internal Revenue Code does not require that a notice of deficiency

be signed by anyone and that where it is issued and sent to the taxpayer in the name of the Commissioner and a petition is then filed with us, the taxpayer cannot complain. *Commissioner* v. *Oswego Falls Corporation*, 71 F. 2d 673 (C.A. 2, 1934), affirming 26 B.T.A. 60 (1932); *Fanny Newman et al.*, *supra*.

The notices here were both in the usual form and issued in the name of Dana Latham, Commissioner, on the letterhead of the U.S. Treasury Department, Internal Revenue Service. They were mailed to the petitioners, received and acted upon by them as determinations of deficiencies in income tax by the Commissioner. In the petitions filed herein it is affirmatively alleged that "The deficiencies determined by the Respondent are in income taxes in the amounts of * * * $15,806.18 for the fiscal year ended January 31, 1960" (the Perlmutters, Inc.) and "The deficiencies determined by Respondent are in income taxes in the amounts of * * * $13,164.76 for 1959" (Ben and Bernice Perlmutter). These allegations are among the few admitted by the respondent's respective answers. The parties in their pleadings were in complete agreement that the respondent determined the deficiencies which are the subject matter of this lawsuit and their disagreement extends only to the validity of the notices.

It is axiomatic that the intent and purpose of the statutory requirement for the issuance of deficiency notices is to inform the taxpayer that the Commissioner means to assess additional taxes against him, and to provide time for the taxpayer to petition this Court for a redetermination if he is so advised. Here the taxpayers knew, and indeed admitted, that the respondent meant to assess deficiencies in income taxes against them; they received the notices issued in respondent's name and promptly invoked our jurisdiction to redetermine the deficiencies in question. To paraphrase the language of Judge Learned Hand in *Olsen* v. *Helvering*, 88 F. 2d 650, 651 (C.A. 2, 1937), affirming a Memorandum Opinion of this Court, their petitions here made it perfectly plain that they were not misled and enjoyed every privilege which a notice formally correct and issued by George Allan would have given them. This being true, we are unwilling to construe even a tax statute in the archaic spirit necessary to defeat these levies; the notices are only to advise the person who is to pay the deficiency that the Commissioner means to assess him; anything that does this unequivocally is good enough.

The notices here need not have been signed by anyone. *Commissioner* v. *Oswego Falls Corporation*, *supra*. The fact that they were signed by V. Lee Phillips, an "identical additional district director," did not invalidate them and we hold they were good enough and that we have jurisdiction to redetermine the deficiencies here in issue.

The petitioners' motions to dismiss are denied.

### Reasonable Compensation

Section 162(a)(1) of the Internal Revenue Code of 1954 provides that "a reasonable allowance for salaries or other compensation for personal services actually rendered," shall be allowed as a deduction as a business expense. Respondent disallowed $19,001.44 of the salary paid by petitioner corporation to its officer-stockholder Ben Perlmutter, for the fiscal year ended January 31, 1960, because respondent determined that it was excessive and unreasonable by that amount.

Petitioner corporation contends that the salary of $53,901.44 paid to Ben during the taxable year ended January 31, 1960, was reasonable in amount in view of the personal services actually rendered and deductible in full under the statute. Petitioner further contends that in addition to being reasonable for that taxable year, the amount of $53,901.44 was paid to Ben partly to compensate him for services rendered during the 4 preceding fiscal years, claiming that in each of those years his salary was unreasonably low.

The issue of reasonableness of compensation for personal services presents a question of fact. *Huckins Tool & Die, Inc.* v. *Commissioner*, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; *Golden Construction Co.* v. *Commissioner*, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court. The respondent's determination as to what constituted reasonable compensation to the corporation's president for the taxable year in controversy carried with it a presumption of correctness and the petitioner corporation has the burden of proving error and, further, the reasonableness of the larger amount claimed herein. *Miles-Conley Co.* v. *Commissioner*, 173 F. 2d 958 (C.A. 4, 1949), affirming 10 T.C. 754 (1948); *Geiger & Peters, Inc.*, 27 T.C. 911, 920 (1957).

There are no fixed rules or exact standards for determining what constitutes reasonable compensation, for each case must be resolved on its own particular facts and circumstances. *Golden Construction Co.* v. *Commissioner, supra*, and authorities there cited. The taxpayer's burden is to adduce evidence as to the appropriate factors which afford a satisfactory basis for this Court to determine the value of the services rendered or the reasonableness of the claimed compensation and the presence or absence of any factors deemed necessary in the particular case will bear upon whether the taxpayer has met its burden of proof. *Miles-Conley Co.* v. *Commissioner, supra*.

In the instant case Ben Perlmutter was the organizer, sole owner, and dominant officer of the petitioner corporation, and, further, he fixed his own salary as president during the course of the taxable year involved. Under such circumstances, the salary so paid is subject to close scrutiny as to the reasonableness thereof. *Heil Beauty Supplies, Inc.* v. *Commissioner*, 199 F. 2d 193 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court; *Ecco High Frequency*

*Corporation* v. *Commissioner*, 167 F. 2d 583 (C.A. 2, 1948), certiorari denied 335 U.S. 825, affirming a Memorandum Opinion of this Court.

Ben made all final decisions as to all phases of the business of the corporation and its success was due primarily to his experience, organizational ability, and efforts. Prior to the fiscal year 1959, Ben devoted full time to the corporation's business activities, but thereafter spent only one-half to three-fourths of a day at the corporation's building-site office and the rest of the day in various business activities. As to the latter circumstance the record is indefinite as to how much time was actually devoted to the corporation's business and how much on personal interests. This situation indicates that Ben devoted less time and service to the corporation in the taxable fiscal year 1960, in which the greatly increased salary was paid.

A comparison of the corporation's gross receipts and taxable income shows a steady increase during the 3 fiscal years 1956, 1957, and 1958, a decline in the fiscal year 1959, and a further decline in the fiscal year 1960. The corporation never paid any dividends despite a steady increase in its accumulation of earned surplus throughout the fiscal years 1956 to 1960, inclusive. A comparison of Ben's salary for the several years discloses a greatly disproportionate increase in salary for the fiscal year 1960 over the prior years and the record fails to establish any increase in the value of his services or in the amount of services rendered in that year over the prior years, or, in fact, that the substantial increase in salary bore any demonstrable relation to the personal services actually rendered.

There is no evidence whatsoever in the record herein with respect to comparable reasonable salaries paid by similar business concerns for similar services. Petitioner corporation relies upon opinion testimony as to the value of its president's services for the taxable fiscal year 1960 and prior years, namely, Ben Perlmutter an interested party, his nephew Jordan Perlmutter interested at least by blood relationship, and Jacob S. Grazi, the only wholly disinterested witness. Ben valued his own services at $55,000-$65,000 for the taxable fiscal year 1960 and the same for all years except the first year of the corporation's existence.

In contrast to this testimony to support the corporation's claimed officer's salary deduction of $53,901.44 for the fiscal year ended January 31, 1960, it is noted that Ben reported a salary of $34,900 from the corporation on his joint individual tax return for the calendar year 1959, which embraced 11 months of the corporation's fiscal year 1960. Jordan who was one of the three stockholder officers of a corporation engaged in an extensive business of developing land and building homes in Colorado and other States valued Ben's services at $55,000-$60,000 for the taxable fiscal year 1960 and the same for the 3 prior years, but he failed to mention as a comparative, the scale of executive

salaries paid by his own corporation or any other corporation in a similar business. Jacob, who was president and one-fourth stockholder of a corporation engaged in developing land and building homes in the Denver area, valued Ben's services at $55,000–$60,000 for the taxable fiscal year 1960, but added that he did not believe it was possible to employ one man to take on all of Ben's responsibilities unless he had an investment in the business, and, further, said that he could not testify as to what salary would be paid a man for such services if he had no investment in the business. Contrary to petitioner's contention, this Court is not bound by the valuation opinions asserted by these witnesses, even though uncontradicted. *Golden Construction Co.* v. *Commissioner, supra; Heil Beauty Supplies, Inc.* v. *Commissioner, supra.* In the light of the facts of record, such testimony has given little assistance to the Court in determining the reasonableness of the claimed compensation deduction.

Petitioner corporation further contends that the amount of $53,901.44 salary paid to Ben for the taxable fiscal year 1960 was partly to compensate him for past services rendered during the 4 preceding fiscal years, claiming that in each of those years his salary was unreasonably low. The short answer is, that there is no factual basis of record to support this contention.

Petitioner corporation has failed to carry its burden of proof of error. Upon consideration of the whole record we have concluded and found as a fact that a reasonable compensation for the services of Ben Perlmutter as president of the petitioner corporation for its fiscal year ended January 31, 1960, was not in excess of the amount determined by respondent, namely, $34,900. Respondent is sustained on this issue.

## Allocation of Overhead Expense

This issue arises from respondent's disallowance of $21,142.18 of petitioner corporation's claimed ordinary and necessary business expense deduction for the fiscal year ended January 31, 1960. The disallowance rests upon respondent's determination that a portion of certain expenditures pertained to the cost of a shopping-center building constructed by petitioner in that year and retained by it for rental purposes.

The parties do not controvert the well-established rule of law that an expenditure in connection with the acquisition of a capital asset, here a building for use in the petitioner's business, is a capital investment and not deductible from income as an ordinary and necessary expense of carrying on business. *Acer Realty Co.* v. *Commissioner of Internal Revenue*, 132 F. 2d 512 (C.A. 8, 1942) and authorities there cited, affirming 45 B.T.A. 333 (1941) ; and *Herbert Shainberg*, 33 T.C. 241 (1959).

In the *Acer Realty Co.* case, the corporate taxpayer's officers were paid salaries for services which included managing the construction of new buildings, thereby saving the expense of a general contractor, and the amounts of such salaries allocated to the latter services were disallowed as a deduction on the ground that they constituted a capital investment and not an ordinary expense of carrying on the business of the corporation.

In the *Shainberg* case, several categories of expenditures claimed as business expense deductions from income, were disallowed as constituting capital expenditures in connection with the acquisition of a capital asset consisting of shopping-center buildings. Such expenditures relating to the acquisition of the capital asset included the State sales tax on construction materials, accounting service fees, cleaning services to ready the buildings for use, and insurance during construction.

In the instant case the parties are in agreement that this issue presents purely a question of fact.

Petitioner contends that the respondent's formula for his allocation of the overhead expense was arbitrary and not based on the facts, and, therefore, may not be sustained. However, on brief, in suggesting a different formula for an allocation, petitioner tacitly admits that some portion of certain items should be allocated to the cost of the shopping center. Petitioner proposes that with respect to officer's salary, other salaries, and insurance, the amount should be $\frac{4}{12}$ of the respondent's 0.2013 percentage of those items and only 5 percent of such $\frac{4}{12}$ figure for the items of office expense and utilities. Petitioner would eliminate the items of depreciation (said to relate to vehicles), truck expense, and legal and audit, on the ground that none of them related to construction of the shopping center.

The petitioner's proposed substitute allocation is a shot in the dark and not supported by the record herein. The testimony of petitioner's witnesses on this issue was indefinite and inconclusive, except that its own accountant testified that although he recognized that an allocation should have been made he could not begin to make one on the facts at hand in his audit of the company's books for the taxable year, and, further, he made no attempt to make any allocation as a witness on the stand. The record discloses that considerable planning and work was done on the shopping-center project long prior to the start of construction in October 1959, the petitioner's accountant and attorney did perform some services pertaining to the construction of the shopping center, and Ben Perlmutter had very indefinite recollections as to whether or not the trucks were used in that project, at least to some extent.

The respondent contends that since petitioner made no allocation of the expenditures on its books or income tax returns, he made an appropriate allocation and, further, since the record herein fails to estab-

lish any basis for a different allocation, his determination should be sustained. We agree with respondent. Furthermore, it may be observed that this issue as presented centers on the reason given for respondent's disallowance of a portion of a claimed business expense deduction. To prevail herein petitioner has the burden of establishing that the disputed expenditures were actually incurred *in carrying on* the business of the corporation, *Acer Realty Co.* v. *Commissioner of Internal Revenue, supra,* and this petitioner has failed to do.

### Sonny's Auto Sales

On their joint income tax return for 1959, Schedule D, Ben and Bernice Perlmutter claimed a short-term capital loss of $16,818.45, identified as Sonny's Auto Sales and shown to have been acquired in December 1958, at a cost basis in that amount and disposed of in May 1959, for nothing. Respondent disallowed such claimed deduction.

The original petition herein did not allege error in the above disallowance. By amendment to petition, filed at the trial, petitioners allege as follows:

4. E. The Respondent erred in determining petitioners were not entitled to an ordinary loss in the amount of $16,818.45 in the calendar year 1959 in a business venture known as Sonny's Auto Sales.

5. L. During the calendar year 1959 petitioner Ben Perlmutter expended an amount of $16,818.45 in a business venture known as Sonny's Auto Sales. Said amount is properly deductible by the petitioners in said year as an ordinary and necessary business expense.

Respondent's answer to the amendment to petition denies the allocation of error in said paragraph 4. E. and also denies the allegations of facts in said paragraph 5. L.

On brief petitioners contend that this issue is purely one of fact, as to whether Ben incurred a "business loss" or whether the amount involved constituted a gift as determined by respondent. Petitioners further contend that the evidence is clear, convincing, and uncontroverted that Ben entered into a business venture with Marvin known as Sonny's Auto Sales and that the amount expended by Ben in such venture constituted an "ordinary and necessary business expense" and was never intended as a gift.

Respondent contends that Ben had no proprietary interest in the business of Sonny's Auto Sales and, further, that the money advanced to or paid on behalf of that business by Ben was not an ordinary and necessary business expense or a deductible loss incurred by Ben but instead constituted a gift to help establish his daughter and son-in-law in business.

At the outset it is well to note that the amount involved is not "undisputed" as petitioners state in their brief. Respondent's answer denies the allegations of error and facts set forth in the amendment to

petition, which puts the burden of proof on petitioners. The record herein fails to establish the alleged total amount of $16,818.45, but does show that Ben's 1958 advances to Sonny's Auto Sales and his 1959 payments to creditors on its behalf, totaled $15,531.09.

In the recent case of *Ray S. Robinson*, 44 T.C. 20 (1965), we said:

A joint venture has been defined in general terms to be a "special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation" and "an association of persons to carry out a single business enterprise for profit." *Beck Chemical Equipment Corporation*, 27 T.C. 840, 848–849; *Estate of L. O. Koen*, 14 T.C. 1406, 1409; *Chase S. Osborn*, 22 B.T.A. 935, 945. Whether a business undertaking entered into by two or more persons constitutes a joint venture depends largely on the terms of their contract and their actions in carrying out its provisions.

As was noted in *Hubert M. Luna*, 42 T.C. 1067, 1077, "[w]hether parties have formed a joint venture is a question of fact to be determined by reference to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes. * * * Therefore, while all circumstances are to be considered, the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise." * * *

Contrary to petitioners' contention we do not find the evidence to be clear, convincing, and uncontroverted that Ben Perlmutter entered into a business venture known as Sonny's Auto Sales with Marvin Bernstein, and that Ben's advances and expenditures in connection therewith constituted an ordinary loss or an ordinary and necessary business expense. We do find that the exhibits and the testimony of petitioners' witnesses disclose confusion as to the factual circumstances involved in this issue.

Documents from the records of the State of Colorado show that the dealer's license was applied for and issued to Barbara Bernstein as the sole owner of the business known as Sonny's Auto Sales and that Marvin was a salesman in that business. They fail to show that Ben had any interest therein either financial or otherwise. As a witness Ben was asked if he could reconcile the documentary evidence with his statement that he had an interest in the business and he answered, "I still had an interest in that business, yes," but this statement was never amplified as to the character of his interest. Ben also testified that as a homebuilder it would not be good for the public to know that he was involved in the used car sales business; that his 1958 advances totaling $13,500 represented "the amount of monies I put into Sonny's Auto Sales purchase"; and that his 1959 payments with personal checks to various creditors of Sonny's Auto Sales totaling $2,031.09, were made "to meet my obligation." There is no showing of record as to the existence of any written or oral agreement of partnership or joint venture as between Ben and Marvin and/or Barbara. Ben did not testify in regard to that matter and neither Marvin nor Bar-

bara appeared as a witness. On the whole, Ben's testimony on this issue was generalized, unconvincing, and rather sparse.

The officer of the Guaranty Bank & Trust Co. who refused the loan sought by Ben Perlmutter on February 24, 1958, testified that from the conference at the time, he had the impression that Ben and Sonny Bernstein were going into the used car business together, in the nature of a partnership. Further, because the bank's signature card for the checking account opened in the name of Sonny's Auto Sales showed that it was a "joint" account requiring the signatures of both Ben Perlmutter and Sonny Bernstein on all checks issued on such account, the bank official concluded that the used car business was a joint venture.

The witness Soto who was employed by Sonny's Auto Sales testified that it was his understanding that Ben Perlmutter owned the business.

The certified public accountant who performed accounting services for Sonny's Auto Sales and for Ben Perlmutter, individually, testified that it was his idea that Ben's advance of $13,500 to Sonny's Auto Sales in 1958 was in the nature of a business investment and thus listed as an asset on Ben's individual balance sheet for personal credit purposes in September 1958. The accountant further testified with respect to such advance, that his understanding of the matter was that after the money was repaid then Ben and his son-in-law "would share in the profits over and above what it would take his son-in-law to live on."

There is no testimony or documentary evidence herein with regard to whether Ben's 1958 advances were evidenced by notes. There is no evidence as to what the books and records of Sonny's Auto Sales showed as to whether the business was individually owned by Barbara Bernstein in accordance with the dealer's license or whether Ben had any proprietary interest therein.

The testimony of the witnesses on this issue was indefinite, inconclusive, and contrary to certain documentary evidence. Also petitioners failed to produce the testimony of either their daughter, Barbara, or their son-in-law, Marvin "Sonny" Bernstein. From this we can only infer that their testimony would not have favored petitioners' contention herein on this issue. *Wichita Terminal Elevator Co.*, 6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). The record fails to establish to our satisfaction that Ben Perlmutter's participation in the Sonny's Auto Sales venture constituted his entry into a business enterprise for profit resulting in a deductible ordinary loss or an ordinary and necessary business expense. For failure of proof, respondent's determination on this issue must be sustained.

The statutory notice of deficiency to Ben and Bernice Perlmutter for the year 1959 increased their taxable income by an unreported

amount of $13,716.44, determined to be taxable as dividend income under adjustment (a) of said notice. The original petition alleged error in said determination. Paragraph 10 of the stipulation herein states that petitioners concede that the amount of $13,716.44 was received from the Perlmutters, Inc., and is properly includable in income for 1959, and then further states that "Petitioners maintain that said amount constitutes salary whereas respondent maintains that said amount constitutes dividends." No evidence or argument was presented on that issue and it is deemed abandoned by petitioners. Respondent's determination increasing Ben and Bernice Perlmutter's 1959 income by the unreported sum of $13,716.44 is sustained.

In view of the stipulations and concessions by the parties herein,

*Decisions will be entered under Rule 50.*