Lakewood Manufacturing Co. v. Commissioner.
Lakewood Mfg. Co. v. Commissioner
Docket Nos. 5903-68, 4527-69.
United States Tax Court
T.C. Memo 1970-133; 1970 Tax Ct. Memo LEXIS 230; 29 T.C.M. (CCH) 597; T.C.M. (RIA) 70133; May 28, 1970, Filed William F. Snyder, Penthouse, One Erieview Plaza, Cleveland, Ohio, for the petitioner. John P. Graham, for the respondent. 598 TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax of petitioner: Fiscal Year Ended
Deficiency [1]
May 31, 1960
$ 2,674.72
May 31, 1961
None
May 31, 1962
50,787.30
May 31, 1963
None
May 31, 1964
None
May 31, 1965
None
May 31, 1966
None
May 31, 1967
15,997.60
*231 The only question presented for our consideration is to what extent the compensation, in excess of $60,000 per year, which petitioner paid to Stephen C. Peplin during each of the taxable years 1962 through 1967 shall be allowed as a deduction to petitioner in these years under section 162 (a)(1), I.R.C. 1954. [2]
Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Lakewood Manufacturing Company ("petitioner") is an Ohio corporation with its principal office, at the time its petitions [3] herein were filed, located in Westlake, Ohio. Petitioner, incorporated in May 1953, began business in 1946 as the sole proprietorship of Stephen C. Peplin ("Stephen Peplin") manufacturing close tolerance parts for thermostats. During the Korean *232 conflict the company made common parts for the large automobile companies for the M 48 tank program. As the tank program declined, petitioner returned to close tolerance work. It began producing knee lever assemblies, rest rods and decorative hardware for Singer Sewing Machine Company. This work continued through 1955. At any given time, petitioner has devoted major portions of its production capacity to the production of specified parts for a limited number of customers. In 1956 petitioner began production of small parts for a bowling alley pinsetting device which was being assembled by Otis Elevator Company ("Otis") for Brunswick Corporation ("Brunswick") which was to market it. In 1958, Brunswick decided to build its own plant for the production and assembly of these parts, and to phase Otis out of the picture as an assembly source for pinsetting devices. Brunswick's plant was completed in 1960, For a time in 1960, petitioner was supplying the same parts to both Otis and Brunswick. During the period 1956 through 1960 approximately 85 percent of petitioner's total sales were of pinsetting parts to Otis for Brunswick. Most of petitioner's sales in its fiscal year ended May 31, 1962 were *233 to Otis which was stockpiling parts for Brunswick. These sales reflected the end of petitioner's production of these parts. During its fiscal years ended May 31, 1957 through May 31, 1961 and for the succeeding years, petitioner had sales and profits as follows: Year Ending
Sales
Profits
5/31/57
$ 780,502
$ 24,900
5/31/58
1,197,454
97,592
5/31/59
1,915,468
205,664
5/31/60
3,171,873
176,334
5/31/61
4,274,133
258,552
5/31/62
4,592,646 261,895
5/31/63
2,239,573
(215,102)
5/31/64
1,370,237
(282,591)
5/31/65
1,274,418
(160,933)
5/31/66
1,545,063
(65,297)
5/31/67
2,259,013
22,899
5/31/68
2,300,281
214,133
5/31/69
1,811,402
112,475
5 months to
10/31/69
993,904
211,492
During the early 1960's petitioner had three or four customers, one or two of which accounted for about 90-95 percent of its sales. During the mid and late 1960's petitioner had an increase in the number of its customers to about a half dozen with a more even distribution of sales among customers. Most of petitioner's sales were made up of a limited number of items which petitioner manufactured in volume continuously over a period of years for the same *234 few customers. Sales effort consisted primarily of keeping existing customers happy. No substantial efforts were made to obtain 599 new customers. Petitioner's customer contact was carried on by Stephen Peplin. The minutes of the board of directors, September 8, 1959, refer to the contribution to the success of the company being made by Richard C. Peplin, Stephen Peplin's son, as "Sales Manager" of the company. In addition to his having contact with petitioner's customers, Stephen Peplin, who was 65 years old in 1962, had overall responsibility for manufacturing. The nature and extent of the services he actually rendered to petitioner in this regard are unclear. Petitioner employed a production superintendent to supervise the actual production. The production superintendent worked under the direction of one of Stephen's sons. The minutes of the board of directors, September 8, 1959, refer to the contribution to the success of the company being made by Edward D. Peplin, Stephen Peplin's son, "Chief Engineer" of the company. Besides its manufacturing and sales activities, petitioner engaged in research and development of new products. At some time during 1960 or 1961, petitioner *235 hired an engineer who had an idea to mechanize packaging of socks for the sock industry in order to reduce the labor costs of manufacturing socks. With the help of this engineer, "and [Stephen Peplin] helped somewhat too," petitioner developed a sock packaging machine which was ready to ship on October 3, 1961, when a fire in petitioner's plant occurred. After the fire petitioner abandoned the development of this product. At some time during 1960 or 1961, petitioner hired Frank Parker ("Parker") who had invented and patented a single-lever faucet valve to control the flow of hot and cold water. Petitioner "developed" the Parker Valve and obtained additional patents. Stephen Peplin worked on the development of the valve with Parker. Petitioner has a 45 percent interest in the Parker Valve patent rights, while Stephen Peplin has a 40 percent interest, and Parker a 15 percent interest. On June 21, 1962 and on August 10, 1962, respectively, nonexclusive licenses of the Parker Valve patent rights were given to the Speakman Company and to the Murray Corporation. Petitioner has received net proceeds under these licenses of $33,148. The record does not show the nature or extent of whatever *236 research and development work has been done on the Parker Valve since the dates of the granting of these licenses. The record does not show what services Stephen Peplin rendered on this project, nor is there any evidence of the value of what services he did render, if any, might be. During the period 1960 through 1961, petitioner was developing a merchandising unit for gas stations, called the S.C.P., a display unit which would display several items such as oil, windshield wiper blades, wiping rags, etc. In conjunction with the development of this merchandising unit petitioner acquired the rights to a patent, called the Gates patent, for a device to be used in service stations that would drain oil from oil cans more efficiently than other devices that were being used. All the prototypes of this device were destroyed in the fire of October 3, 1961, and all research and development work on this project was abandoned. In April or May 1961, petitioner became involved in the development of an automatic pin scorer for bowling (referred to as "Escore"). Petitioner hired the two inventors of the device, Bob Boucherle and Everett Mentzer, sometime in May. Ernest C. Webb ("Webb"), a graduate *237 mechanical engineer with extensive experience in development enigineering, had been hired earlier in 1961 by Stephen Peplin as a consulting engineer to work on the development of the Parker Valve on a part-time basis. In April, Stephen Peplin asked Webb to come in and take over supervision of the development of the pin scorer. At this time, Webb started working full-time as a consulting engineer on this project. He continued to work for petitioner until September 1966. During the period from May 1961 until October 3, 1961, Stephen Peplin was consulted regularly on the development of Escore and made useful suggestions. After October 3, 1961, the date of the fire, research and development work on Escore continued under the supervision of Webb who continued to be employed by petitioner until September 1966. During the seven or eight months following the fire, Stephen Peplin did not actively participate in research and development, although he was informed of the progress being made on Escore. For the remaining period of the years in issue, the record does not establish the nature and extent of the services Stephen Peplin actually rendered to petitioner's research and development projects. *238 The fire of October 3, 1961 caused extensive damage to the office and storage 600 areas at petitioner's plant. While the production facilities were not directly affected, the fire resulted in the disruption of petitioner's manufacturing operations for a period of about six months and resulted further in the loss of prospective orders. Petitioner carried fire insurance and business interruption loss insurance. Petitioner recovered by settlement on its fire insurance the following amounts: In February 1962, petitioner recovered $103,189.98 for loss to the contents; in April 1962 petitioner recovered $60,871.65 for damage to its buildings; and in October 1962, a year after the fire, petitioner recovered $47,441.51 for stock losses. The determination of the amount of business interruption loss sustained has been the subject of continuous and extensive negotiation and litigation between petitioner and various insurance companies, which has resulted in a judgment of the Federal District Court presently pending appeal, awarding petitioner $278,000. Petitioner also has initiated further litigation seeking recovery for alleged damages resulting from the wrongful refusal of the insurance *239 companies to settle petitioner's claims at an earlier date, and other damages. In its dealings with the insurance companies, petitioner was represented by the same law firm which is representing it in this proceeding. Stephen Peplin actively worked with these lawyers in their representation of petitioner in its claims. Stephen Peplin is not a lawyer, although he has studied business law under a business administration correspondence course, the Lasalle Extension Course. The nature and extent of and the value of Stephen Peplin's services to petitioner in his work with its lawyers is unclear. Petitioner is owner or part owner of numerous patents. Stephen Peplin performed some services with respect to the obtaining of these patents. The record does not disclose the nature or extent of the services of this nature which he performed during the years before us. Stephen Peplin was responsible for the management of petitioner's investment portfolio. The record does not disclose the nature or extent of the services which Stephen Peplin rendered petitioner in this respect, nor the value of such services. During its taxable years 1962 through 1967 petitioner's 195 shares of common stock *240 outstanding were held as follows: Stephen C. Peplin
145
Richard C. Peplin
20
(son of Stephen)
Edward D. Peplin
20
(son of Stephen)
Shirley Peplin
5
(daughter of Stephen)
John W. Richards
5
(husband of Shirley)
Total
195
The following persons were the directors and officers of petitioner during these years: Stephen C. Peplin - Director and President Richard C. Peplin - Director and Secretary Edward D. Peplin - Director and Treasurer Edith M. Peplin - Director and Vice President (wife of Stephen) Effective June 1, 1959, the salaries of the officers of petitioner were set by the board of directors as follows: President
$60,000
Secretary
27,500
Treasurer
27,500
On June 1, 1961, the salaries of the officers of petitioner were set by the board of directors as follows: President
$80,000
Secretary
32,500
Treasurer
32,500
Effective January 1, 1967, the salaries of the officers of petitioner were set as follows: President
$60,000
Secretary
40,000
Treasurer
40,000
The authorization of the board of directors setting Stephen Peplin's salary at $60,000, effective June 1, 1959, purported *241 to be based upon continued growth and financial success of petitioner as reflecting the value of his past services, petitioner's need of his continued services, the nature of his responsibilities for current and future operations and the level of compensation paid by other comparable manufacturing companies for services of similar nature and quality. The authorization setting Stephen Peplin's salary at $80,000, effective June 1, 1961, purported to be based upon an increase in his workload based upon the projection of sales and the research and development programs. During the fiscal years ended May 31, 1959 through May 31, 1963, petitioner paid the following amounts in dividends, including the dividends indicated as paid to Stephen C. Peplin: 601 Fiscal Year
Dividends
Ended
Dividends
Paid to S.C.P.
May 31, 1959
$ 4,000
$ 3,000
May 31, 1960
May 31, 1961
12,000
9,000
May 31, 1962
19,500
14,500
May 31, 1963
4,875
3,625
After 1963 petitioner paid only a nominal dividend. The Commissioner determined deficiencies in income taxes for petitioner's taxable years 1962 through 1967, based in part upon his determination that petitioner should not *242 be allowed to deduct more than $60,000 a year as reasonable compensation for the services rendered by Stephen Peplin. Opinion Section 162(a)(1), I.R.C. 1954, provides that "a reasonable allowance for salaries or other compensation for personal services actually rendered" shall be deductible as a business expense. Of the compensation paid to Stephen Peplin during each of the years 1962 through 1967, the Commissioner has disallowed petitioner's deduction of any amount in excess of $60,000 a year as representing unreasonable or excessive compensation. The question of reasonableness of compensation for personal services presents a question of fact. Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; Golden Construction Co. v. Commissioner, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court. The Commissioner's determination that no more than $60,000 constitutes reasonable compensation to Stephen Peplin during any of the years 1962 through 1967 carries with it a presumption of correctness. Petitioner has the burden of proving the reasonableness of the larger amounts *243 claimed. Miles-Conley Co. v. Commissioner, 173 F. 2d 958 (C.A. 4, 1949), affirming 10 T.C. 754; Ben Perlmutter, 44 T.C. 382, 401, affd. 373 F. 2d 45 (C.A. 10, 1967). Specifically, its burden is to adduce evidence which affords a satisfactory basis for this Court to determine the value of the services rendered or the reasonableness of the claimed compensation. Miles-Conley Co. v. Commissioner, supra. Among the factors to be considered are the volume of the taxpayer's business; the experience, skill, and qualifications of the employee; the importance of the services which the employee performs; the amount of time the employee devotes to the business; the extent to which the employee's services contribute to the success of the business; and the standard of compensation for similar services in the industry. Consolidated Apparel Co., 17 T.C. 1570, affirmed on this issue 207 F. 2d 580 (C.A. 7, 1953). Recognizing the difficulty which is inherent in proving that the value of the services rendered by Stephen Peplin was $80,000 a year rather than $60,000 a year, as determined by the Commissioner, *244 we extended to petitioner all the latitude in matters of proof which fairness demands to meet this burden. We cannot say it has done so, however, on the record we have before us. Petitioner has sought to substitute job descriptions and titles for evidence of services actually rendered by its president. It is improbable that if Stephen Peplin actually rendered the services which are implied by these descriptions and titles and worked 80 hours a week during this entire period, as he claims to have done, he could not have been more specific in his testimony as to what he actually did. We agree with petitioner that the most persuasive evidence of the value of Stephen Peplin's services would be the opinion of a qualified expert witness. Petitioner sought to present such evidence in the testimony of Richard Walker ("Walker"). We have carefully considered that testimony and have found little help in it. The record as a whole persuades us that Stephen Peplin did not actually render all of the services which were implied as the basis of Walker's opinion as to the reasonableness of his compensation. Accordingly, we uphold the determination of the Commissioner. Decision will be entered *245 under Rule 50. 602 Footnotes
1. While there are no deficiencies determined for the years 1961, 1963, 1964, 1965, or 1966, those years are in issue because the Commissioner's adjustments in those years affect the loss carryovers into the other years for which there are deficiencies.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩
3. The deficiencies for the years 1960 through 1965 and for the years 1966 and 1967 were separately determined in separate notices of deficiency with respect to which separate petitions were filed. The cases have been consolidated.↩