Archie P. Sherar and Terry A. Sherar v. Commissioner.
Sherar v. Commissioner
Docket No. 3127-69.
United States Tax Court
T.C. Memo 1971-146; 1971 Tax Ct. Memo LEXIS 186; 30 T.C.M. (CCH) 637; T.C.M. (RIA) 71146; June 17, 1971, Filed. Archie P. Sherar and Terry A. Sherar, pro se, 1259 Lerila Way, Pacifica, Calif.Leo A. McLaughlin, for the respondent. 638 SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner' income tax for the calendar year 1964 in the amount of $1,168.73. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether respondent is collaterally estopped by the decision in Sherar v. United States, an unreported decision of the United States District Court for the Northern District of California, affirmed 413 F. 2d 986 (C.A. 9, 1969), from denying in the instant case that a transaction between one of petitioners and the parents of one of petitioners was a bona fide sale and lease transaction. *187 (2) If respondent is not estopped from denying that the sale and lease was bona fide, was that transaction in fact a sham. (3) Whether petitioners' loss carryback from 1967 to 1964 is in excess of the $5,162.69 determined by respondent because of respondent's failure to allow a sufficient amount of loss on certain store fixtures disposed of by petitioners in 1967. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Pacifica, California at the time their petition in this case was filed, filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, San Francisco, California. Archie P. Sherar, Sr., and Helen C. Sherar (hereinafter referred to as the senior Sherars), the parents of petitioner Archie P. Sherar (hereinafter referred to as Archie), resided for a number of years prior to 1964 in Spokane, Washington where they owned and operated a retail gift shop known as the "Town Topper Gift Shop." This gift shop was located on West Sprague Avenue in Spokane. During the years prior to 1964 the senior Sherars purchased store fixtures, furniture, and *188 equipment which they used in the operation of the gift shop. The building in which the gift shop was operated was leased. Sometime prior to July 1, 1964, Archie suggested to the senior Sherars that they enter into a sale and leaseback agreement with him with respect to the store fixtures, furniture, and equipment (hereinafter collectively referred to as the fixtures) in their gift shop. Archie's father objected to the suggestion, giving as a reason that the transaction might result in publication around Spokane of his son's name which was the same as his. Archie's mother then suggested that the transaction could be put through with Terry A. Sherar (hereinafter referred to as Terry) as the buyer. Sometime in 1963 the senior Sherars had listed the gift shop for sale since the profits which they were making were substantially less than they had been in the 1950's and they were of the opinion that business was moving out of town. On July 1, 1964, the senior Sherars and Terry entered into several agreements. An agreement entitled, "Bill of Sale" recited that for the sum of $18,000 the senior Sherars sold to Terry the fixtures. A list of the various fixtures was attached to the document *189 entitled, "Bill of Sale." Another one of the documents entitled, "Chattel Mortgage" recited that Terry mortgaged to the senior Sherars the fixtures as security for the sum of $17,850 which was to be paid in the manner specified in a promissory note of even date. The document entitled, "Installment Note" likewise dated July 1, 1964, provided that Terry would pay to the senior Sherars $17,850 with interest at 5 percent per annum on the unpaid balance in 96 equal monthly installments of $186 each, the first installment to be paid on the first day of August 1964. Another one of the documents entitled, "Lease" recited that Terry as lessor let unto the senior Sherars as lessees the fixtures contained in the list attached to the document. The list enumerated the same fixtures as did the list attached to the bill of sale. The lease stated that rent would be paid by the lessees to the lessor from July 1, 1964 to July 1, 1972 in the total sum of $21,606.32, in installments as follows: Amount of
Number of
Total of
each month-
monthly
monthly
Year
ly payment
payments
payments
1964
$288.90
5
$1,444.49
1965
252.23
12
3,026.81
1966
242.95
12
2,915.43
1967
233.63
12
2,803.61
1968
224.34
12
2,692.02
1969
215.04
12
2,580.42
1970
205.74
12
2,468.82
1971
196.44
12
2,357.22
1972
188.21 7
1,317.50
96 $21,606.32
*190 The lease further granted to the lessees an option to buy the fixtures at the end of the 8-year term for their appraised fair market value or $3,000 whichever was less. On July 1, 1964, Terry paid to the senior Sherars $150 in cash. The amount of rent determined was intended to equal over the 8-year period the amount of the principal and interest to be paid under the installment note. In 1964 Terry paid the senior Sherars $2,239.30 which she listed as consisting of $1,444.49 in principal and interest payments for 1964 on the installment note and $794.81 paid on December 31, 1964, as advance interest. In 1964 the senior Sherars paid Terry $1,444.50. On schedule C of their income tax return for the calendar year 1963 the senior Sherars listed the fixtures which were the subject of the documents dated July 1, 1964, as having a cost of $9,054.05 with depreciation previously allowed or allowable in prior years of $5,089.58 and allowable depreciation in 1963 of $562.49. On their income tax return for the calendar year 1964 the senior Sherars reported a gain of $14,572.02 as resulting from the sale of the Town Topper fixtures to Terry. They elected the installment method of reporting *191 gain. In their computation of the gain they showed the assets sold to Terry as having cost $9,061.05. Archie, who is a former internal revenue agent, prepared the income tax returns of the senior Sherars for 1963 and 1964. On their 1962 and 1963 personal property tax returns filed with Spokane County, Washington, the senior Sherars listed the personal property located at the West Sprague Avenue store as having a total cost of $10,472 and the assessor's valuation of this property was shown as $2,670 and $2,655, respectively, for these years. After the documents dated July 1, 1964, had been executed the senior Sherars continued to operate the gift shop and used the same fixtures which they had used in their business prior to July 1, 1964, and listed as sold in the list attached to the Bill of Sale. During the period after July 1, 1964 the senior Sherars continued their efforts to sell the gift shop but also continued to operate it until January 17, 1967. Prior to 1967 on two different occasions, certain individuals expressed an interest in purchasing the gift shop and the senior Sherars stated to the prospective purchasers that the fixtures were owned by someone in California and *192 could either be purchased or leased by the prospective purchaser. Neither of these inquiries as to purchase of the shop resulted in a sale. Helen C. Sherar was told by each of the prospective purchasers that he was unable to obtain a lease on the building for the $300 a month rental that the senior Sherars were paying. One such prospective purchaser told Helen C. Sherar that the landlord was considering selling the building and the other told her that her landlord asked $400 a month for a lease of the space to him. On January 17, 1967, the senior Sherars entered into two written agreements with Merle J. Osborne and Marjorie Lee Osborne (hereinafter referred to as the Osbornes). One of these agreements was entitled, "Conditional Sale Agreement" and the other, "Lease and Option to Purchase." Pursuant to these agreements the senior Sherars sold the Osbornes the inventory of the Town Topper Gift Shop for $6,350 and leased to them the fixtures used therein for a period of slightly over 4 years for a monthly rental of $50 with the first year's rent free and an option to purchase the fixtures at any time during the lease period for $8,000. The agreement further provided that the Osbornes *193 were required to keep the fixtures insured against loss by fire in an amount of not less than $8,000 during the first year. An attorney represented the senior Sherars in connection with the preparation of the agreements entered into between them and the Osbornes. This same attorney prepared a document entitled, "Agreement" which was executed by Terry on January 17, 1967. This document provided that Terry approved the conditional sale agreement and fixtures lease with option to purchase agreement entered into by the senior Sherars with the Osbornes and the option to purchase the fixtures for $8,000 granted to the Osbornes by the latter of those agreements. The senior Sherars agreed to save Terry harmless from any loss by reason of the sale and to continue the monthly payments to Terry under her lease until the Osbornes exercised their option. 640 In 1965 and 1966, the senior Sherars paid Terry $3,026.76 and $4,083.55, respectively, and Terry paid the senior Sherars $2,232 and $2,915.43, respectively. Included in the payments by the senior Sherars to Terry in 1966 was an amount of $1,168.15 paid by check dated December 31, 1966, which was designated as advance rent. Since December 31, 1966, the *194 senior Sherars have made no further payment to Terry under the document dated July 1, 1964, entitled, "Lease." In 1967 Terry paid to the senior Sherars $711.37. Since 1967 Terry has made no further payments to the senior Sherars under the terms of the document dated July 1, 1964, entitled, "Installment Note." The difference in the total amount paid to Terry by the senior Sherars and the total amount paid by Terry to them was Terry's estimate of the total personal property tax she would owe to the State of Washington on the fixtures while the fixtures were leased to the Osbornes. At the time the various documents were executed in 1964 Terry and Archie prepared a document entitled, "Analysis of Income, Expense and Tax Effect under the Terms of the Contracts of Sale and Lease of Certain Store Fixtures." This document showed that the total payments of principal and interest which Terry would make on the installment note secured by the chattel mortgage would be, over the 8 years until it was paid in full, $21,606.32, the same amount that the senior Sherars would pay over this period of years as rent under the lease. For each year the total amount shown as payable for principal and interest *195 on the note equaled the total amount payable as rent under the lease document. The document also showed the effect on the lessor's income tax liability of electing a 150 percent declining balance method of computing depreciation and electing 20 percent additional first year depreciation and the effect on the lessor's income tax of electing straight line depreciation. Archie and Terry filed with their 1964 income tax reurn a form 3468 "Computation of Investment Credit." They showed as the total qualified investment "Retail store fixtures 18,000.00." They showed the tentative investment credit to be $1,260 and the investment credit used in 1964 to be $35.36, which was the amount of 1964 income tax they computed to be due prior to use of the investment credit. They showed on that form that the investment credit exceeded their income tax by $1,224.64. Archie and Terry claimed this $1,224.64 excess investment credit as a carryback of investment credit to their taxable year 1962. They filed a suit in the United States District Court for the Northern District of California (Civil No. 45983), claiming a refund for the year 1962 based on a reduction in their income tax previously paid for *196 the year 1962 by the amount of the claimed investment credit carryback. On December 28, 1967 a pre-trial conference was held in the case and the United States District Court Judge entered an interim pre-trial order in which the defendant was directed to file a motion for summary judgment within 10 days on the issue of whether the store fixtures and equipment qualified as "Used Section 38 Property" as defined in section 48(c)(1), I.R.C. 1954, for which Terry could claim an investment credit. This order provided in part as follows: The following are to be taken as true only for the purpose of ruling on defendant's motion for summary judgment: * * * h. The plaintiff Terry A. Sherar purchased the store fixtures and equipment of the Town Topper gift shop from Archie P. Sherar, Sr. and Helen C. Sherar as of July 1, 1964. i. The plaintiff Terry A. Sherar leased the store fixtures and equipment of the Town Topper gift shop back to Archie P. Sherar, Sr. and Helen C. Sherar as of July 1, 1964. j. The sale and leaseback transaction with the plaintiff Terry A. Sherar was entered into by Archie P. Sherar, Sr. and Helen C. Sherar to broaden the market for potential buyers of the Town Topper *197 gift shop. On January 2, 1968, the United States filed its Motion for Summary Judgment in Civil Action No. 45983 and this motion was granted by the Court on January 23, 1968. Archie and Terry appealed to the United States Court of Appeals for the Ninth Circuit and that Court on June 24, 1969, affirmed the judgment of the United States District Court for the Northern District of California (413 F. 2d 986). The Ninth Circuit stated the taxpayers' claim to be that they were entitled to the investment credit under section 38 by virtue of the sale and leaseback transaction and discussed and decided that issue and only that issue. The Ninth Circuit concluded that the store fixtures did 641 not qualify as "Used Section 38 Property" since the fixtures were used by the same individuals before and after the sale and leaseback transaction. The Ninth Circuit affirmed the judgment of the district court. In their petition filed in this case and again more specifically in an amended petition, petitioners claimed that they were entitled to a net operating loss carryback of $10,373 from their taxable year 1967 to the year 1964. [1]
*198 Respondent through his agent conducted an audit of petitioners' income tax liability for the year 1967 and as a result of the audit he determined, and in this case concedes, that petitioners incurred a loss in 1967 in the amount of $5,162.69 which they are entitled to carry back to the year 1964. [2]
*199 Sometime in 1959 Archie and Terry decided that they would open in San Francisco the same type of gift shop that the senior Sherars were operating in Spokane. They decided that they would build the fixtures which would be used in this gift shop. In February 1959 after they had decided to open a gift shop, Archie and Terry moved into a rented duplex apartment with a basement on Capital Avenue. The basement was under not only their side of the duplex but the other side of the duplex. In this basement Terry had her washer and dryer for the purpose of doing her home laundry and there were some suitcases and boxes stored. Archie kept his work shop equipment in the basement. Soon after they moved into the duplex Apartment on Capital Avenue, they began purchasing material to make the fixtures for the gift shop they planned to open. Archie and Terry would work on the fixtures in the evenings and on weekends. At the time both of them held full-time weekday positions. They kept the materials for the fixtures and the partially completed fixtures in the basement area of the Capital Avenue duplex as long as they lived there. The total rent which they paid with respect to the Capital Avenue duplex *200 from February 2, 1959 through May of 1962 was $3,327. In May 1962, Archie and Terry bought a house on Crespe Drive for which they paid $19,300. When they moved into this house they moved the workshop and other items that were in the basement at the Capital Avenue residence including the material on which they were working to make the fixtures into the basement of their new home. They lived in this house until March 1963, when they moved into a house on Lerida Way which they purchased for $23,500. Again they moved the partially completed fixtures, the workshop equipment and other items that had been in the basement of their other homes into the basement of this house. Archie used his workshop not only to work on the fixtures but to fix things around the house and in later years to work on certain rental property which he and Terry acquired. Archie and Terry worked on the fixtures from 1959 through 1965 but never completed them. They did complete six or eight display tables and three sets of wall fixtures except that the glass was not installed and the fixtures were not sanded and painted. In the latter part of 1967 they decided that it would not be practicable for them to complete *201 the fixtures and open a gift shop so they sold the uncompleted fixtures as salvage. During 1959 through 1963 Archie and Terry would use a truck which they owned or the automobile they owned to drive to lumber yards and other places that sold building materials to purchase items to use in building the fixtures. Petitioners 642 computed the "fixture manufacturing cost allocation" which they contend should be added to the material cost in determining their loss on the fixtures as follows: Fixture
manufacturing
cost
Total
allocation
Rent, 1035 Capitol Ave., 2/59 through 5/62
3,327.00
Allocation 25 percent (based on space value estimate)
$ 832.00
Depreciation, 1424 Crespi Drive, 5/62 through 3/66
Cost
$19,300
Less land 4,300
Basis for depreciation
15,000
Depreciation at 4 percent at 58 months = $2,900
Allocation 25 percent (based on space value estimate)
725.00
Depreciation, 1259 Lerida Way, 3/66 through 11/67
Cost
$23,500
Less land 6,500
Basis for depreciation
18,000[ sic]
Depreciation at 4 percent at 20 months = $1,066
Allocation 25 percent (based on space value estimate)
266.00
Utilities 4/59 through 11/67
2,145.00
Allocation 20 percent (based on use estimate)
429.00
Truck and auto expense, 5/59 to 1/64
1,359.99
Allocation 70 percent (based on estimated operating cost)
952.00
Fixture Insurance
178.00 178.00
Total $3,382.00
*202 Petitioners on their joint Federal income tax return for 1964 reported rental income in which they included the $1,444.49 which had been paid to Terry by the senior Sherars under the agreement of January 1, 1964. They claimed a depreciation deduction on the fixtures which were the subject of the sale and leaseback agreements of $4,950 which was comprised of $3,600 claimed additional first year depreciation on a declining balance basis and $1,350 claimed as regular depreciation on the basis of a 8-year useful life. They claimed an interest deduction which included interest in the amount of $1,159.30 claimed to have been paid by Terry on the installment note of July 1, 1964 including the so-called advance payment of $794.81. They claimed a miscellaneous expense deduction in connection with reporting their rental income which respondent determined included $100 with respect to the transactions of July 1, 1964. Respondent in his notice of deficiency disallowed the depreciation deduction of $4,950, interest of $1,159.30 and miscellaneous deduction of $100 claimed by petitioners on their income tax return with respect to the sale and leaseback transaction and reduced the amount disallowed *203 by the reported rental income of $1,449.49 resulting in a net disallowance with respect to this transaction of $4,759.81 In explanation of the disallowance, respondent stated that the purported purchase and lease transactions were sham transactions which served no business purpose and which were entered into solely to avoid income tax. Petitioners in their amended petition claimed that in addition to the amount of $1,057 of material cost allowed by respondent as a loss in connection with the fixtures they abandoned, they should be allowed as additional loss on abandonment of the fixtures in 1967 manufacturing costs incurred in connection with building the fixtures of $3,382, thereby increasing by this amount the $5,162.69 loss carryback which respondent has conceded petitioners are entitled to carry back to 1964 under the conditions heretofore stated. Ultimate Findings of Fact 1. The transaction of July 1, 1964 between the senior Sherars and Terry A. Sherar was without substance. 2. Petitioners are entitled to deduct $500 of overhead costs in addition to the $1,057 material cost determined by respondent as cost of the abandoned fixtures, thereby increasing their carryback *204 from 1967 to 1964 as computed by respondent by $500. 643 Opinion Petitioners have not explained the legal basis for their position that respondent is estopped by the district court case with respect to the year 1962 from contending that the transactions of July 1, 1964 were a sham and lacked substance. Respondent in his brief assumes that petitioners base this contention on the fact that for the purpose solely of the determination of the motion for judgment on the pleadings it was stipulated in the district court case that there was a sale and a lease. If this is the basis of petitioner's contention, we agree with respondent that he is not collaterally estopped because of the district court case from denying in this case the validity of the purported sale and leaseback of July 1, 1964. If this is not the basis of petitioner's contention, there is no apparent basis for it. Where different tax years are involved as is the situation here, the judgment in the prior action operates as an estoppel not as to matters which might have been litigated and determined but only as to those matters in issue upon the determination of which the verdict was rendered. Commissioner v. Sunnen, 333 U.S. 591 (1948). *205 It is clear from the facts we have found that there was no controversy in the district court case with respect to the bona fides of the sale and leaseback agreements but that it was agreed solely for the purpose of determining the merits of the government's motion for judgment on the pleadings that there was a sale and leaseback. The bona fides of the sale and leaseback agreements were not matters presented and determined in the district court case. Therefore, respondent is not collaterally estopped from contesting the bona fides of this transaction in this case. Commissioner v. Sunnen, supra. From the facts we have found we conclude that there was no substance to the transaction of July 1, 1964, and that the only purpose the transaction would serve would be to reduce petitioners' taxes and probably the taxes of the senior Sherars. In a comparable situation, the Supreme Court has held that a transaction should not be recognized for income purposes. Knetsch v. United States, 364 U.S. 361 (1960). In that case the Court stated, "Plainly, therefore, Knetsch's transaction with the insurance company did 'not appreciably affect his beneficial interest except *206 to reduce his tax * * *.' Gilbert v. Commissioner, 2 Cir., 248 F. 2d 399, 411 (dissenting opinion)." The Court went on to state that nothing of substance was realized by the taxpayer from the transaction beyond a tax deduction. The same is true here. Petitioners contend that they did have other purposes in mind, one of those purposes being that the senior Sherars would be helped in the financing of the sale of their gift shop by leasing instead of owning the fixtures in the shop and the other contention being that Terry intended to make a profit by owning the fixtures at the end of the 8-year period and selling them. There is no explanation given by petitioners of why the senior Sherars would be better able to sell the gift shop because of having the type of lease arrangement they had made with Terry. Certainly they could have entered into a lease of the fixtures if that became desirable at the time they sold their store and in fact they did do so. The high rental called for by the documents signed on July 1, 1964 would logically be a deterrent to a prospective purchaser and not an inducement to buy. Also, having such a lease would make the arrangements the senior Sherars *207 could offer a prospective purchaser of the store with respect to the fixtures less flexible. The only reason this was not in fact the case was that all parties must have understood that Terry would not try to hold the senior Sherars to their agreement when the agreement no longer served the best interests of all parties by reducing taxes without otherwise financially affecting them. If in substance Terry had owned the fixtures the senior Sherars could not have assured a prospective purchaser that he could buy the fixtures or lease them except by paying the so-called monthly rentals provided by the July 1, 1964 agreement for a period of 8 years and at the expiration of the lease if they elected to buy the fixtures to buy them at the then appraised fair market value but not to exceed $3,000. Without making a precise determination of the fair market value of the fixtures when the senior Sherars entered into the transaction purportedly selling them to Terry for $18,000, the facts in this record make it clear that the fair market value was far less than $18,000. The second reason which petitioners contend shows the transactions to have substance also lacks validity under the facts of *208 this case. At the time the agreements of July 1, 1964 were entered into the senior Sherars were attempting to sell their store 644 and Terry knew it. They continued after the July 1, 1964 papers were signed to attempt to sell the store and Terry knew of the attempt. Petitioners make the argument that the fixtures had little value except in place in the store that was then being operated in explanation of the problem encountered by the senior Sherars in attempting to sell the gift shop business. If this is true, it is obvious that there was never any intent that the purported agreement run for 8 years to completion. Petitioners, themselves, put evidence in the record to show that the amount that the senior Sherars would pay to Terry under the agreements and the amount that Terry would pay to the senior Sherars were the same in each year and the same in total. In fact, when the store was sold in 1967 and apparently the arrangement though to continue by wording of the agreement was in fact canceled, again showing its lack of substance, the senior Sherars had paid to Terry slightly more than Terry had paid to them. Terry in her testimony stated that it was her recollection that this *209 was because for a few years she would have to continue to pay the personal property tax on the fixtures to the State of Washington since they were still in her name. She said the extra amount which she received was to be used to pay this tax. We sustain respondent's disallowance of the loss claimed by petitioners in their 1964 income tax return to have resulted from the July 1, 1964 transaction since in our view the transaction was a sham. Respondent concedes that Archie and Terry started building fixtures to open a gift shop in a transaction entered into for profit and are entitled to deduct the amount they had put into these fixtures at the time they abandoned them in 1967. Respondent could verify the material costs and allowed the amount so verified in computing the loss carryback from 1967 to 1964. Respondent apparently does not contend as a matter of law that petitioners are not entitled to other costs if they can establish such other costs. It has been recognized in a number of cases that expenses of building a capital asset must be capitalized and recovered through depreciation or when the asset is disposed of. See Ben Perlmutter, 44 T.C. 382, 403-404 (1965), *210 affirmed on another issue 373 F. 2d 45 (C.A. 10, 1965). As we understand respondent's position in this case, it is simply that petitioners have not established any costs of the fixtures which they abandoned in 1967 except the material costs. The evidence is very unsatisfactory with respect to other costs incurred by petitioners. However, there is testimony that petitioners rented a place with a big basement to have more room to work on and store the fixtures and that the houses they bought were geared to having sufficient working space for this purpose. However, there is nothing to show that the rental or depreciable value of the basement space so used is the amount allocated to this space by petitioners. Terry testified that she and Archie ran machinery and used lights and heat when they were working on the fixtures in the area where they had their workshop. She also testified about the trips they made in the automobile to obtain materials for the fixtures. Considering all of the evidence and without attempting to make any precise allocation but weighing heavily against the petitioners for their imprecision, we have concluded that petitioners are entitled to $500 *211 of additional cost in connection with these fixtures resulting in increasing their loss carryback from 1967 to 1964 by this $500 amount. Decision will be entered under Rule 50. Footnotes
1. At the trial petitioners apparently were contending for a loss carryback from 1967 to 1964 of only $8,544.69.↩
2. Respondent computed the loss on the basis that the 1964 sale and leaseback was not a bona fide transaction and conceded the $5,162.69 loss only on the basis of the assumption on which it was computed. However, the amount deductible in 1967 which is here in issue is not dependent on our decision with respect to the sale and leaseback transaction since it involves the abandonment of certain other assets which respondent concedes were acquired by petitioners in a transaction entered into for profit. The computation by respondent of the loss of $5,162.69 included the allowance of a deduction of $1,057 for a loss on "fixtures abandoned." The computation of the $1,057 loss was explained in the report of the revenue agent which was furnished to petitioners and which the parties agree was the basis of the computation used by respondent in arriving at the loss carryback from 1967 as follows: (H) Fixtures abandoned (material only) ($1,057.00) During the period 1959 through 1964 Mr. Sherar acquired material and constructed fixtures to be used in a gift store. The project was abandoned in the year 1967. The fixtures were disposed of in the year 1967. The books and invoices disclosed the following expenditures: ↩
Panels
$ 610.40
Tables
95.35
Displays
26.08
Miscellaneous 325.17 $1,057.00