Skyland Oldsmobile, Inc. v. Commissioner.
Skyland Oldsmobile, Inc. v. Commissioner
Docket No. 4526-69.
United States Tax Court
T.C. Memo 1972-17; 1972 Tax Ct. Memo LEXIS 238; 31 T.C.M. (CCH) 47; T.C.M. (RIA) 72017; January 20, 1972, Filed *238 Respondent has determined that salary and bonuses in excess of $42,500 paid to petitioner's president during the taxable period were unreasonable in amount. Petitioner is an Oldsmobile dealership and its president was the sole stockholder of the company. Held, that the determination of the respondent is erroneous and that all amounts paid to petitioner's president during the taxable period were reasonable in amount and a proper reflection of the value of the president's services to the corporation. J. Larry Broyles, P.O. Box 2727, Charlotte, N. C., David M. McConnell, and James E. Johnson, Jr., for the petitioner. Harvey S. Jackson, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The respondent has determined the following deficiencies in petitioner's income taxes: *239 Calendar Year
Deficiency
1964
$ 7,153.20
1965
15,708.00
1966
14,676.00 These amounts relate to the sole issue which we must determ These amounts relate to the sole issue which we must determine: whether the amounts paid by petitioner to its president for the years in question were reasonable compensation for services rendered. The respondent has disallowed petitioner's deductions for all amounts in excess of $42,500 48 paid as compensation to its president in each of the taxable years. Findings of Fact Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are herein incorporated by this reference. Petitioner, Skyland Oldsmobile, Inc., is a duly authorized North Carolina corporation engaged in business as an automobile dealer in Asheville, N. C. Petitioner maintained its books of account on the accrual method of accounting. Its corporate tax returns for the taxable period were filed with the district director in Greensboro, N. C. During the taxable period, petitioner operated under a franchise from General Motors Corporation for selling and servicing Oldsmobile automobiles. Concurrently, petitioner operated a used *240 car department for the sale at retail and wholesale of used automobiles. Another important aspect of petitioner's business was handling the financing of automobile sales for which petitioner received a commission. Most of the financing was done on a recourse basis with petitioner liable for the balance due by a purchaser in the event of default. Petitioner's authorized capital stock at incorporation in 1936 consisted of 250 shares of $100 par class A (voting) common and 256 shares of $100 par class B (nonvoting) common. The two classes of stock were to share equally in dividends. Prior to October 22, 1959, petitioner's issued and outstanding stock was held by the below-named shareholders and in the number of shares per class of stock as indicated: Number of
Shares
Shareholder
Class A
Class B
Curtis M. Baldwin
250
6
E. B. Shoff, Jr
127
Veronica P. Baldwin
123
Total Shares
250
256
Following Baldwin's death in 1959, Shoff entered into a contract with Veronica P. Baldwin on November 10, 1959, to acquire the Skyland stock held by the Baldwins. During the period between October 22, 1959, and December 31, 1964, Shoff acquired 250 shares of *241 the class A common stock and 129 shares of the class B common stock pursuant to the above agreement at a total cost of $171,237.82, with the result that as of December 31, 1964, Shoff owned all 506 shares (250 shares class A and 256 shares class B) of the petitioner's authorized, issued, and outstanding capital stock. Petitioner paid a cash dividend of $20 per share on its common stock outstanding as of March 1, 1960. Said dividend was the last declared and paid by petitioner. There was no distribution of dividends during the taxable years at issue in this case. During the taxable years involved, petitioner's officers, who were also directors of the company, were as follows: President
E. B. Shoff, Jr.
Vice-president
Veronica P. Baldwin
Secretary-Treasurer
Marian B. Shoff
Edward B. Shoff, Jr. (Shoff) was employed by petitioner as a salesman in 1953. He was a college graduate. In 1956, he attended the General Motors Institute on Dealer Management. Between 1953 and 1959, he worked as a salesman, in the service department, the accounting office, and as used car sales manager. Shoff filed joint income tax returns with his wife, Marian, with the district director *242 in Greensboro for the taxable years 1964, 1965 and 1966. In 1953, when Shoff went to work for petitioner, Baldwin, his father-in-law, was president and general manager of petitioner. Baldwin was in charge of the overall operation of the dealership and was compensated by a salary and bonus arrangement. In 1956, it was discovered that Baldwin had cancer. He began to spend less time at work because of declining health. It was at this time that Shoff began to acquire the 127 shares of petitioner's nonvoting common stock which he held on October 22, 1959. On December 4, 1959, shoff became the dealer-operator of petitioner under a General Motors interim selling agreement. He was 29 at the time. The agreement authorized petitioner to sell Oldsmobiles in all of Buncome County, N.C., and the south portion of Madison County, N. C. This included the Asheville, N. C., metropolitan area. The agreement was to last for two years until December 4, 1961. The objective of the two-year agreement was to give Shoff an opportunity to demonstrate his ability to successfully operate the franchise. If Shoff was not successful in the two-year period, the franchise would be lost. In 1959, the petitioner *243 was considered a problem dealership by the Oldsmobile division of General Motors. It was producing a less than satisfactory return on 49 investment, its profits were low, and its penertration of its market class was unsatisfactory. Petitioner was known in the Asheville area as a hard place to do business; its prices were high; its top management was very thin (Baldwin had become very ill and qualified replacement personnel were not trained); cash flow was inadequate and as a result petitioner did not have the available capital necessary to finance new and used car sales; there was a large turnover of salesmen; and the repossession rate was high and petitioner had to absorb the losses caused by its recourse financing. Petitioner's pre-tax and pre-bonus profit record before Shoff took total command of the dealership operation was as follows: Pre-tax,
Pre-bonus
Year
Profit
1955
$25,725.55
1956
11,962.25
1957
14,940.76
1958
484.71 When Shoff became dealer-operator in 1959, he assumed fulland began to attack the problems extant in petitioner's business. At the time, petitioner's sales were low, its management disorganized, its finances in poor condition, *244 its employee morale at low ebb, and its profitability minimal. One of Shoff's first areas of concern was the sales department. However, the old sales manager held over from the Baldwin days resisted any management or sales innovations. This individual finally left the employ of Skyland in July 1961. Shoff then assumed the full duties of the general sales manager. In 1962 and 1963, in full command of the sales department, Shoff began to rebuild a sales force. New salesmen were hired and a training program for them was begun. Another problem inherited by Shoff was the location of the dealership. After he became dealer-operator, Shoff searched for a new locale. On January 1, 1962, the dealership moved into new and better headquarters in a single multi-story building. To combat the losses the dealership had incurred on the repossessions, Shoff changed the dealership's financing policies. Since it was determined that a great part of the repossessions occurred in the financing of used cars, the dealership adopted a new policy with respect to these financings. Credit was only henceforth extended to persons with very good credit who had paid a substantial down payment. Otherwise, the *245 cars were to be financed only on a nonrecourse basis with small loan companies. Shoff required each salesman to submit a complete credit statement to him on each financing transaction for his approval. Following the departure of the old sales manager from the business, Shoff instituted an imaginative and consistent advertising program, something that the dealership had never done previously. The campaign was designed to sell Skyland's products and to improve the dealership's image in the community. Shoff personally prepared the advertising copy for the company and made all decisions vis-a-vis the type of advertising to use, where it should be used, and when. During the taxable period in question here, Shoff acted as chief executive officer, sales manager, new car sales manager, used car sales manager, advertising manager, and customer relations manager. He worked a 70-hour week and took no vacations during this period. Petitioner's pre-tax and pre-bonus profit record after Shoff took over in 1959 was as follows: Pre-tax
Pre-bonus
Year
Profit
1959
$ 31,800.14
1960
23,159.24
1961
19,930.46
1962
81,356.46
1963
93,352.22
1964
88,810.80
1965
119,747.13
1966
109,829.88
*246 Petitioner reported the following gross sales, gross profit and taxable income for the taxable years indicated: Taxable
Gross
Taxable
Year
Sales
Gross Profit
Income
1960
$1,357,544.65
$191,268.60
$10,346.61
1961
1,300,979.11
197,670.55
2,973.86
1962
1,859,770.71
267,14 3.46
33,960.96
1963
2,050,671.57
293,680.73
34,112.01
1964
2,142,495.17
302,129.73
24,966.75
1965
2,603,933.97
359,113.46
33,822.06
1966
2,712,918.59
362,341.65
26,002.50
During the taxable years 1960 to 1966, inclusive, Shoff was compensated for his services to petitioner on a salary and bonus arrangement as follows: Year
Salary
Bonus
Total
1960
10,772.97
$10,772.97
1961
12,000.00
$ 8,560
20,560.00
1962
12,000.00
31,658
43,658.00
1963
12,000.00
37,009
49,009.00
1964
12,000.00
41,825
53,825.00
1965
12,000.00
60,100
72,100.00
1966
12,000.00
57,950
69,950.00
The dealership's sales soared to an alltime high under Shoff's direction. The 50 business became highly profitable. During the period 1964 through 1966, Shoff's local advertising campaign became a model for Oldsmobile dealers in the United States. *247 In terms of market penetation, i.e., the number of Oldsmobiles sold as compared to the number of cars being sold in the same class, Shoff was first among Oldsmobile dealers in North and South Carolina and among the top 25 agencies in the entire United States. During this period, Shoff received recognition as an outstanding executive from both the Oldsmobile dealers in the United States and the president of General Motors by being chosen to serve on the General Motors president's advisory council. The bonuses paid Shoff under his salary arrangement with petitioner were based on an evaluation of the overall operations of the business in terms of growth, profitability and market penetration, the overall effectiveness of his management and his knowledge of similar performances in similar dealerships. The capital requirements of the company, such as its anticipated need for a new business location, were also considered. The bonus determination was made by Shoff and the other directors before the close of each business year, at a point when the year's success or failure could be fairly judged. Respondent submits that the salary and bonus arrangement of Shoff provided him with compensation *248 for services rendered which was not reasonable for the years 1964 through 1966 to the extent such compensation exceeded $42,500 per annum. Petitioner contends that the salary and bonus paid Shoff was reasonable. If we decide for petitioner, a computation under Rule 50 will be required because of a concession made by petitioner with respect to a multiple surtax issue under section 1562(b) of the Internal Revenue Code of 1954. [1]
Ultimate Finding of Fact The compensation paid by petitioner to its president in the form of salary and bonus for the taxable years 1964 through 1966, inclusive, was for services actually rendered and the amounts thereof were reasonable compensation for such services. Opinion The only issue is whether the salary and bonuses paid by petitioner to its president and sole stockholder in excess of $42,500 during each of the taxable years in question were reasonable compensation for services actually rendered. Section 162 of the 1954 Code provides that: *249 There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Section 1.162-7(b)(3) of the Income Tax Regulations provides that "[in] any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances." The issue to be decided is a question of fact to be determined on the basis of the circumstances in each case. Ben Perlmutter, 44 T.C. 382 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967). Reference can be made to salaries of employees in similar positions in order to ascertain the reasonableness of the salary paid here. The determination of the respondent is presumed correct and petitioner has the burden of proving that determination erroneous. Botany Worsted Mills v. United States, 278 U.S. 282 (1927). *250 If petitioner, by competent testimony and evidence, has shown the respondent's determination to be erroneous, the respondent's presumption loses its effect and the Court must determine from all evidence submitted what was reasonable compensation in this particular circumstance. In deciding the reasonableness of compensation, we must pay particular attention to situations such as the one before us where large amounts of compensation are paid by closely held corporations to employees who own a majority, or all, of the company's capital stock because the compensation paid in these situations must not only be reasonable in amount but must also be paid for services actually rendered. This is particularly so, as here, where the closely held corporation has paid no dividends. In the closely held corporation situation, it would be an easy maneuver for the owneremployee to take the corporate profits out of the business in the form of deductible compensation rather than nondeductible dividends. Conversely, however, the reasonableness of compensation paid to an owner-employee who has rendered valuable *251 services should not be limited for the sole reason 51 that the employee is the owner and could have taken part of the amount paid to him out of the corporation as dividends. Among the many factors to be analyzed in making our decision are the following: the employee's qualifications for his position; the nature, extent, and scope of his work; the size and complexities of the particular business; a comparison of salaries paid with gross and net income; the prevailing general economic conditions; the amount of compensation paid to the particular employee in previous years. In the situation before us, we are presented the case of an individual who turned a problem Oldsmobile dealership into one of the most successful Oldsmobile operations in the country. Shoff had worked for six years for Skyland before he took over in 1959 and was well qualified to run the dealership. The company's pre-tax, pre-bonus profit was $484.71 in 1958 and $31,800.14 in 1959. This profit figure soared to $88,810.80 in 1964, $119,747.13 in 1965, and $109,829.88 in 1966. Gross sales rose from $1,357,544.65 in 1960 to a peak of $2,712,918.59 in 1966. Unquestionably, the phenomenal turnaround in Skyland's *252 business resulted from Shoff's managerial abilities, advertising innovations, promotional activities, and organizational skills. The glowing success story of this dealership extant in the record can only be attributed to the efforts of one man, Edward B. Shoff, Jr. Petitioner's testimony in this case strongly rebuts the presumption of correctness afforded the respondent's determination. We must now assess all of the evidence and determine what was reasonable compensation in this case. The bonus which Shoff received each year was not determined by a fixed percentage or ratio. At some point in each fiscal year, when an approximation of the success being obtained in that year could be made, the bonus would be determined. The determination would never be made, however, after the close of the fiscal year. What was reasonable in these circumstances? The evidence presented indicates that Shoff worked long hours for petitioner and that he was responsible for all phases of Skyland's business - advertising, sales (new cars and old cars), financing, customer relations, and promotions. Shoff wore many hats, apparently took no vacations, and worked a 70-hour week. The evidence is clear that *253 Shoff's individual efforts were responsible for Skyland's vastly improved condition. In an effort to assist the Court in determining the reasonableness of the compensation in this case, petitioner produced as a witness James F. Emmert, the assistant zone manager for the Oldsmobile division of General Motors in the Charlotte zone. Emmert was called upon to give expert testimony concerning the performance of Oldsmobile dealers. Emmert, in his more than 16 years with the Oldsmobile division, had been in contact with approximately 600 Oldsmobile dealers across the United States, had made some type of analysis on about 500 of these dealers, and had made detailed analyses of over 350 of these dealerships. He testified at length about the factors which the Oldsmobile division considered when evaluating the performance of a given dealership or in making a comparison between several dealerships. The crux of his testimony was that in any dealership the owner-dealer has ultimate responsibility for the departmental and overall operation of the dealership. Emmert considered Shoff to be outstanding in each of the evaluation categories analyzed by the Oldsmobile division and that on the basis of *254 overall ability, Shoff would rank among the top five dealers that he had ever met. Emmert concluded his testimony by expressing the opinion that the salary paid to Shoff in each of the taxable years was reasonable and that he would have paid Shoff a similar bonus had he owned Skyland. Emmert had much firsthand knowledge of Shoff's performance with Skyland and was competent to compare Shoff's performance with that of other Oldsmobile dealers he had analyzed. Emmert has spent his professional life analyzing and evaluating the performance of Oldsmobile dealers and his expert opinion of the value and worth of Shoff's performance with Skyland has been most helpful and valuable to our evaluation of the reasonableness of Shoff's salary. Based on all the evidence presented and factors bearing on the issue in question, we have used our best judgment to conclude that Shoff rendered valuable services to Skyland in each of the taxable years in question and that the salary and bonus for each of the three years was reasonable in amount. The Court is mindful that in the automobile business, as in many other forms of business, reward for outstanding managerial and executive talent must be geared *255 to the success of the dealership in question. The evidence is clear. Shoff turned Skyland away from the abyss of failure and 52 singularly developed the dealership into one of the most successful automobile operations in the country, let alone the Charlotte zone. We are loath to agree with respondent that Shoff's salary should not have exceeded $42,500 in each of the taxable years. We are of the opinion that the salary and bonus Shoff received in each of the taxable years was reasonable in toto and that such salary arrangement properly reflected the outstanding managerial and executive talent of Skyland's chief executive officer. To reflect our decision on the compensation issue and petitioner's concession on the multiple surtax issue, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩